**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Civil Action No. 2:08 C V 0114 |
| *ex rel.* [UNDER SEAL], | : | |
| | : | |
| BRINGING THIS ACTION ON BEHALF | : | |
| OF THE UNITED STATES OF AMERICA, | : | Judge MARBLEY |
| THE STATES OF ILLINOIS, DELAWARE, | : | MAGISTRATE ABEL |
| INDIANA, NEW YORK, RHODE ISLAND, | : | |
| TEXAS, NEW MEXICO, NEW HAMPSHIRE, | : | |
| MICHIGAN, GEORGIA, AND OKLAHOMA, | : | **Filed Under Seal Pursuant to** |
| AND THE COMMONWEALTHS OF | : | **31 U.S.C. 3720 (b)(2)** |
| MASSACHUSETTS AND VIRGINIA | : | **and Local Rule 5.1.5(a)(1)** |
| | : | |
| Plaintiffs and Relator | : | |
| | : | |
| v. | : | **DO NOT SERVE** |
| | : | |
| [UNDER SEAL] | | |

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

RECEIVED

FEB 0 7 2008

JAMES BONINI, Clerk
CINCINNATI, OHIO

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN  DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *ex rel*. KEVIN P. McDONOUGH | : | Civil Action No. _____ |
| c/o Frederick M. Morgan, Jr. | : | |
| Morgan Verkamp LLC | : | |
| 700 Walnut Street, Suite 400 | : | |
| Cincinnati, Ohio 45202 | : | |
| | : | |
| Bringing this action on behalf | : | |
| Of THE UNITED STATES OF AMERICA | : | Judge _____ |
| and the STATES OF ILLINOIS, DELAWARE, | : | |
| INDIANA, NEW YORK, RHODE ISLAND, | : | |
| TEXAS, NEW MEXICO, NEW HAMPSHIRE, | : | |
| MICHIGAN, GEORGIA, and OKLAHOMA | : | **Filed Under Seal Pursuant to** |
| and the COMMONWEALTHS of | : | **31 U.S.C. 3720 (b)(2)** |
| MASSACHUSETTS AND VIRGINIA, | : | **and Local Rule 5.1.5(a)(1)** |
| | : | |
| Plaintiffs and Relator, | : | |
| | : | |
| v. | : | **DO NOT SERVE** |
| | : | |
| SYMPHONY DIAGNOSTIC SERVICES, INC. | : | |
| and SYMPHONY DIAGNOSTIC SERVICES | : | |
| NO. 1 d/b/a MOBILEX, U.S.A. | : | |
| 920 Ridgebrook Rd., 2nd Floor | : | |
| Sparks, MD 21152, | : | |
| | : | **COMPLAINT FOR VIOLATIONS** |
| ZAC MANAGEMENT, LLC, | : | **OF THE FALSE CLAIMS ACT** |
| ZAC CAPITAL PARTNERS, | : | |
| ZAC MOBILEX HOLDINGS, LLC, and | : | |
| MOBILEX ACQUISITION GROUP, LLC | : | |
| 101 West Ave., Suite 300 | : | |
| Jenkintown, PA 19046, | : | |
| | : | |
| JASON LIU, M.D., INC.; | : | |
| JASON YEH-SHENG LIU | : | |
| 18822 Beach Blvd., #207 | : | |
| Huntington Beach, CA 92648, | : | |
| | : | |

DONALD LANESE, M.D.                              :
651 Lakeview Plaza Blvd.                         :
Worthington, OH 43085,                           :
                                                 :
MANOR  CARE,  INC., d/b/a HCR/                   :
MANOR CARE                                       :
333 N. Summit St.                                :
P.O. Box 10086                                   :
Toledo, OH 43699-0086,                           :
                                                 :
EXTENDICARE HEALTHSERVICES, INC.                 :
111 West Michigan St.                            :
Milwaukee, WI 53203-2903,                        :
                                                 :
BEVERLY ENTERPRISES, INC., a/k/a                 :
GOLDEN LIVING CENTERS, INC.                      :
1000 Fianna Way                                  :
Fort Smith, AK, 72919,                           :
                                                 :
KINDRED HEALTHCARE, INC.                         :
680 S. Fourth St.                                :
Louisville, KY 40202,                            :
                                                 :
LIFE CARE CENTERS OF AMERICA                     :
3570 Keith St. NW                                :
P.O. Box 3480                                    :
Cleveland, TN 37320-3480,                        :
                                                 :
NATIONAL HEALTHCARE CORPORATION                  :
300 Vine St.                                     :
Murfreesboro, TN,                                :
                                                 :
COVENANT CARE, INC.                              :
27071 Aliso Creek Rd., Suite 100                 :
Aliso Viejo, CA 92656,                           :
                                                 :
          and                                    :
                                                 :
HARBORSIDE HEALTHCARE,                           :
a/k/a SUN HEALTHCARE GROUP                        :
18831 Von Karman, Suite 400                      :
Irvine, CA 92612,                                :
                                                 :
          Defendants.                            :

- 3 -

## I.    INTRODUCTION

1.     Qui Tam Relator Kevin P. McDonough brings this action on behalf of the United States and the named States and Commonwealths for treble damages and civil penalties arising from Defendants' conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, and in violation of the False Claims Acts of the States and Commonwealths identified herein.  The violations arise out of false claims for payment made to Medicare, Medicaid, TRICARE and other federally funded and federal-state funded healthcare programs, which in this Complaint are sometimes referred to in the aggregate as "Government Healthcare Programs".

2.     This complaint details several related areas of illegal conduct by Defendants which caused the submission of thousands of false claims in violation of the False Claims Act.  Defendants' schemes include (1) illegal kickback schemes by Defendants to provide and/or accept reduced rates for mobile x-ray services to nursing homes for Medicare Part A patients in exchange for referrals of patients covered by Medicare Part B and other government healthcare programs; (2) overbilling schemes designed to hide these reduced rates from federal and state governments; (3) fee splitting with radiologists in exchange for referrals to secure additional discounted costs to further promote such kickback schemes; (4) substandard and worthless services resulting from  this improper focus on obtaining illegal referrals of federally-funded business; and (5) illegal upcoding of services not ordered by the physician.

## II.    JURISDICTION AND VENUE

3.     Many of the acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein occurred within the Southern District of Ohio, and most or all defendants do business in the Southern District of Ohio.  Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. 3732(a) and 28 U.S.C. § 1345.

4.     Venue lies in this District under 31 U.S.C. § 3732(a).

5.     The facts and circumstances alleged to liability have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

6.     Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

7.     Relator provided disclosure of the allegations of this complaint to the United States and each of the affected States and Commonwealths prior to filing.

## III.    PARTIES

### A.    Plaintiffs

8.     The United States of America is the real party in interest to the claims advanced in Counts I and II, and the States of Illinois, Delaware, Indiana, New York, Rhode Island, Texas, New Mexico, New Hampshire, Michigan, Georgia, and Oklahoma, and the Commonwealths of Massachusetts and Virginia, are real parties in interest to those claims asserted pursuant to their respective False Claims Acts.

9.     Relator Kevin McDonough lives in Florida.  He was certified as an x-ray technologist in 1978.  From 1983 through 1999, he owned a company which provided mobile x-ray services in Florida, and from 1994 to 1997, he owned a company which provided such services in Georgia.  At their peak, these businesses serviced the mobile x-ray needs of about 130 nursing homes.

10.     Mr. McDonough was for many years active in the National Association of Portable X-Ray Providers, serving as its vice-president from 1993 through early 1998. He served as charter vice president of the Florida Alliance of Portable X-Ray Providers from 1996 until 1999.  He remains active in both organizations.

11.     Beginning in late 1996, nursing home clients began terminating their contracts with Mr. McDonough's mobile x-ray businesses.  He was told that his competitors were providing services at below-market-value rates.

12.     Mr. McDonough sold his Georgia company in 1997 and the Florida company in 2000.  From 2000 to 2005 he worked as a consultant to other mobile x-ray companies.

13.     In September 2005, Mr. McDonough was hired by defendant Mobilex.  He worked from Mobilex's Midwest Regional Office in Worthington, Ohio from October 2005 to September 2006.  He was hired to assist Mobilex's midwest operations and oversee the reopening Mobilex's dorman Southeast office, based in Florida.

14.     While employed by Mobilex, Mr. was in regular contact with William Glynn, the chief executive officer of Mobilex, and regularly discussed Mobilex's business practices with Glynn.

- 6 -

15.    The practices which resulted in the submission of false claims Mr. McDonough witnessed were uniformly implemented throughout the MobilexUSA nationwide system.

**B.    The MobilexUSA Defendants**.

16.    Defendant Symphony Diagnostic Services, Inc., a Delaware Corporation d/b/a Symphony Mobilex, and Defendant Symphony Diagnostic Services No. 1, Inc., a California Corporation, d/b/a Symphony Mobilex and Mobilex USA became wholly-owned subsidiaries of Integrated Health Services Inc. in the mid 1990's.

17.    In or about February 2000, IHS filed bankruptcy.  he resulting reorganization, led to purchase of Symphony Mobilex by former officers of Symphony and then or shortly thereafter began operating as MobilexUSA.

18.    The purchasing entity was Defendant Mobilex Acquisition Group, a Delaware limited liability company. Acquisition Group is a subsidiary of Defendant ZAC Mobilex Holdings, yet another Delaware limited liability company.

19.    Defendant ZAC Capital Partners assisted in the financing of the acquisition of Symphony Diagnostic Services and has continued to assist in the management of the company.  ZAC Capital Partners, a Delaware limited liability company, is a wholly-owned subsidiary of Defendant ZAC Management, LLC.

20.    The owners and officers of ZAC Management are also the owners and officers of ZAC Capital Partners, ZAC Mobilex Holdings, and Mobilex Acquisition Group.  These companies are referred to herein as "ZAC Management."

21.     Symphony Diagnostic Services, Inc. and its subsidiaries, including Symphony Diagnostic Services No. 1, Inc., now do business in 30 states, including Ohio, as MobilexUSA, hereinafter called "Mobilex."

22.     Mobilex's midwest regional office, located at 651E Lakeview Plaza Blvd., Worthington, OH 43085, coordinates service in Ohio, Indiana, Illinois, Wisconsin, Kentucky and West Virginia.

23.     Mobilex's southwest regional office, located at 9635 Wendell Road, Dallas, TX, 75243, coordinates service in Texas, Oklahoma, Arkansas, New Mexico, Nebraska, Utah, Kansas, Missouri and Iowa.

24.     Mobilex's southeast regional office, located at 13773 Icot  Blvd., Suite 502, Clearwater, FL, 33760, coordinates service in North Carolina, South Carolina, Georgia, Alabama and Florida.

25.     Mobilex's northeastern regional office is located at 2 Jonathon Drive, Brockton, MA and coordinates service in Maine, New Hampshire, Vermont, Rhode Island,  Connecticut, and Massachusetts.

26.     Mobilex's eastern regional office is located at 101 Rock Road, Horsham, PA, and coordinates services in New Jersey, Pennsylvania, Delaware, Maryland, Virginia, Washington, D.C.,  North Carolina, South Carolina, and Georgia.

27.     The policies and procedures in place in the Midwest regional office are the same policies and practices used nationwide.  The schemes leading to submission of false claims with which Mr. McDonough became familiar while working for Mobilex in Columbus are imposed by the management defendants and coordinated nationwide.

28.     Defendant Jason Liu, M.D. ("Liu") is the chief radiologist for Mobilex.

29.     Defendant Don Lanese, M.D. ("Lanese") is a radiologist for Mobilex.

30.     Defendant Jason Liu, Inc. ("Liu, Inc."), is a California corporation that, upon information and belief, supplies contract radiologists and radiological services to Mobilex. Liu, Inc., has a contract with Mobilex.  Liu, Inc. is a Class A holder of a 10% ownership interest in Mobilex Acquisition Group, which owns Symphony Diagnostics d/b/a MobilexUSA.

31.     On information and belief, Liu, Lanese, and/or Liu, Inc. have contracted to permit Mobilex to bill Medicare Parts A and B, Medicaid, and other insurers for their medical services.

**C.     Nursing Home and Long-Term Care Defendants.**

32.     Defendant Manor Care, Inc. d/b/a  HCR Manor Care Services, ("Manor Care") operates long term health care centers with associated rehabilitation and assisted living centers.  Manor Care is a Delaware corporation with its corporate headquarters in Toledo, Ohio.  Manor Care has facilities in, among other Ohio cities, Westerville and Columbus.

33.     Beginning no later 2005, Manor Care entered into a nationwide contract with Mobilex for the provision of portable x-rays in Manor Care facilities in at least the states of Connecticut, Pennsylvania, New Jersey, Delaware, West Virginia, South Carolina, Florida, Ohio, Illinois, Indiana, Kentucky, Kansas, Iowa, Missouri, Texas, and Oklahoma, and the Commonwealth of Virginia.

34.     Beginning in or about 2003, Manor Care had a contract in Ohio for portable x-ray services with Regional Diagnostics, which was purchased out of bankruptcy by MobilexUSA in August, 2005.  Regional Diagnostics sought bankruptcy procection in part because of the effect on its profitability of providing Part A mobile x-ray services priced below cost.

35.     Defendant Extendicare Healthcare Services, Inc., ("Extendicare") operates long term health care centers with associated rehabilitation and assisted living centers in several states, including Ohio, with facilities in Columbus and West Jefferson, Ohio.  Extendicare is a subsidiary of Extendicare REIT, a Canadian Corporation with domestic headquarters in Milwaukee, Wisconsin.

36.     Beginning in or about no later than 2001, Mobilex provided services to Extendicare under a contract covering at least the states of Ohio, Pennsylvania, New Jersey, Delaware, West Virginia,  Indiana, Wisconsin, Kentucky and Texas.

37.     Defendant Beverly Enterprises ("Beverly) operated long term health care centers with associated rehabilitation and assisted living centers.  Beverly is a Delaware corporation with its corporate headquarters located in Fort Smith, AK.  Upon information and belief, beginning in 1998, Mobilex had a nationwide contract with Beverly for the provision of mobile x-ray services.

38.     In or about February 2006, Beverly was acquired by Fillmore Strategic Investors, LLC, which merged Beverly with its subsidiary, Pearl Senior Care.   The combined entity became GGNSC Holdings, d/b/a Golden Horizon.  Fillmore Strategic

Investors is a Delaware corporation and is affiliated with Fillmore Capital Partners, also a Delaware company with corporate offices in San Francisco, CA.

39.     Golden Horizon continues to operate long term health care centers under the name of Beverly Living Centers and Golden Living Centers.

40.     Upon information and belief, defendant Mobilex provided services to defendant Beverly and successors Beverly Living Centers and Golden Living Centers in at least the following states:  Pennsylvania, Maryland, Virginia, North Carolina, Georgia, Indiana, Missouri, Illinois, and Wisconsin.

41.     Defendant Kindred Healthcare, Inc. ("Kindred"), through its Health Services Division, operates long term care facilities with associated nursing homes, rehabilitation facilities and assisted living facilities.  Kindred is a Delaware corporation headquartered in Louisville, Kentucky.

42.     Kindred was formerly known as Vencor, Inc., and resulted from Vencor's emergence from Chapter 11 reorganization in or about early 2001.

43.     Kindred operates nursing homes and other long-term care facilities in many locations, including Columbus, Ohio.

44.     Defendant Life Care Centers of America ("Life Care") operates long-term care facilities with associated nursing homes, rehabilitation facilities and assisted living facilities.  Life Care is a Tennessee corporation with its corporate headquarters in Cleveland, Tennessee.

45.     Life Care operates long-term care facilities in many locations, including Columbus, Ohio.

46.     Beginning in approximately 1998, Life Care was party to a nationwide contract with Mobilex for the provision of portable mobile x-ray machine services to its long-term care facilities.

47.     Defendant National Healthcare Corporation ("NHC") is a Delaware corporation with its principal office in Murfreesboro, Tennessee.  NHC operates nursing homes and other long-term care facilities in many states.  NHC does business with defendant Mobilex, including defendant Mobilex's MidWest office in Worthington, Ohio, for services provided to NHC's facilities in Kentucky and Missouri.

48.     Defendant Covenant Care, Inc., ("Covenant") is a privately owned, for-profit healthcare company headquartered in Aliso Veijo, California.  It provides long term care centers with associated rehabilitation care in many locations, including Georgetown, Ohio.

49.     Covenant has had a nationwide contract with Mobilex for the provision of portable x-ray services in its nursing homes since in or about 1998.

50.     Defendant Harborside Healthcare Corporation ("Harborside") operated nursing homes and other long-term care facilities in many locations nationwide, including Lancaster, Marion, and New Lexington, Ohio.

51.     In or about April, 2007, Harborside was purchased by Defendant Sun Healthcare Group ("Sun").

52.      Sun operates long term care facilities through its subsidiary SunBridge Healthcare Group.  Harborside and Sun are Delaware corporations headquartered in Irvine, California.

53.     On information and belief, Harborside and Sun have had contracts with Mobilex since at least 1998.

54.     Manor Care, Extendicare, Beverly, Kindred, Life Care, NHC, Covenant Care and Harborside/Sun, are sometimes hereinafter collectively referred to as "Defendant nursing homes."

## IV.     FACTUAL ALLEGATIONS

55.     This case involves the submission for payment with federal and state funds of a large number of false claims for payment resulting from a swapping arrangement created by Mobilex and marketed to the Nursing Home defendants, which are willing participants.  Mobilex provides portable x-ray services to the Nursing Home defendants at below-cost rates for patients with Medicare Part A coverage in exchange for referrals of patients who do not have Part A coverage.  Mobilex then bills the services provided to patients without Part A coverage at full cost directly to government healthcare programs.

56.     Mobilex also has an agreement with the physician defendants, and defendant Liu, Inc., by which Mobilex bills for the doctors' services.  By this agreement, Mobilex pays the physicials well below market value for their purported interpreation of x-rays in exchange for retention of up to half the physicians' fees.  Mobilex makes up some of its revenue lost in the Part A scheme by taking a cut of the physician fees for.

### A.     Submission of Claims For Portable X-ray Services

57.     The Medicare program, established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et. seq.,* consists of  two parts.  Medicare Part A

- 13 -

authorizes the payment of federal funds for hospitalization and post-hospitalization care, to include care in skilled nursing facilities (nursing homes) and long-term care facilities. Medicare Part B authorizes the payment of federal funds for medical and other health services, including without limitation, physician services, laboratory services, outpatient therapy, diagnostic services and radiology services.

58. Medicare Part B also pays for certain services furnished to facility inpatients who are either not entitled to benefits under Part A or who have exhausted their Part A benefits but are entitled to benefits under Part B of the program.

59. Under the authority of the Social Security Act, the Secretary of HHS administers the Medicare Program through Centers for Medicare and Medicaid Services (CMS). CMS contracts with private insurance companies to administer the processing of claims. Part A reimbursement is processed through fiscal intermediaries. Part B reimbursement is processed through Medicare carriers.

60. Medicare enters into provider agreements with providers and suppliers to establish the facilities' eligibility to participate in the Medicare Program. In order to be eligible for payment under the program, providers and suppliers must certify that they understand that payments of claims are conditioned on the claims and the underlying transactions complying with such laws, regulations and program instructions (including the anti-kickback statute and the Stark laws) .

61. The inpatient facilities at issue in this case are primarily skilled nursing facilities (nursing homes), commonly referred to as SNF's.

62.     The Balanced Budget Act of 1997 changed SNF reimbursement for patients covered under Medicare Part A to a prospective payment system ("PPS"), beginning with the first cost reporting period after July 1, 1998.   Under PPS, skilled nursing facilities are paid a fixed *per diem* amount for each Medicare Part A patient, which covers the routine, ancillary, and capital-related costs associated with that patient's stay.  The *per diem* amount depends on the severity of the patient's condition, classified according to resource utilization groups (RUGs).  The current version of RUG classifications is RUG III.

63.     Generally, the PPS per diem rate for each RUG-III group is established based on Medicare payments for allowable SNF costs under Part A and Part B during applicable cost reporting periods beginning in fiscal year 1995, adjusted by market-based index amounts (accounting for cost increases between cost reporting periods) and case-mix and area-wage level index amounts.  *See* 42 C.F.R. §§ 413.330, 413.337.  During a three year transition period after the implementation of PPS, facilities were paid based on a blend of a facility-specific rate and a federal rate.  42 C.F.R. § 413.340.

64.     Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services.  In order to receive payment, an SNF must submit claims for its Part A patients to its fiscal intermediary on CMS Claim Form 1450 (also called a UB-92).  At the end of its annual cost reporting period, the SNF must submit cost reports detailing the expenses and revenues for its facility along with the patient activity.  This annual cost report is the final claim and is

- 15 -

submitted on CMS Form 2540-96 (unless the facility qualifies for a simplified cost report on Form 2540s).

65.     Annual cost reports constitute the final accounting of the facility's federal program reimbursement: Medicare relies upon the Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. Moreover, as a condition of payment, the SNF must certify in its annual cost report that all data is accurately and truthfully reported and that it has complied with all applicable laws and regulations, including without limitation the Anti-kickback laws.

66.     CMS uses the data submitted on the cost reports to support management of the federal programs, including to develop the cost limits and rates applicable to providers and suppliers.

67.     Each SNF's Part A *per diem* includes the facility's costs for diagnostic radiology services performed for Part A inpatients.  Thus, for mobile x-ray services furnished for Part A inpatients, the SNF pays the supplier for the services, and then bills Medicare for the Part A rate.  The SNF is required to accurately report its actual payments to suppliers, including the mobile x-ray companies, on its annual cost reports.

68.     If the SNF inpatient is ineligible for Part A or has exhausted his or her benefits under Part A, the costs of radiology services are covered under Part B.

69.     In addition, diagnostic radiology services include both a technical and professional component.  The professional component--the radiologist's interpretation

- 16 -

of the x-rays–is billed separately by the physician or the physician's assignees under Part B.   The technical component–the service performed by the portable x-ray supplier–is billed, as described above, either (1) by the SNF if the service is part of the Part A claim or (2) by the portable X-ray supplier if the service is being provided for a SNF resident with no Part A coverage (and so is being reimbursed under Part B).

70.     Prior to the implementation of the PPS, ancillary services such as the portable x-ray services at issue here, could either be billed directly by the portable x-ray supplier or by the SNF under an arrangement with the supplier.  In the latter scenario, the supplier would bill the SNF and then the SNF would bill its fiscal intermediary.  Because of the reasonable cost reimbursement applicable to SNF's at that time, the supplier could bill the SNF at rates well above the Medicare fee schedule and the SNF could submit such costs as part of its annual cost report.

71.     Such billing for portable x-ray services was singled out in a trilogy of reports by the Department of Health and Human Services Office of Inspector General, as an area of Medicare abuse.  Portable Imaging Services: A Costly Option (OIG, November 1997), http://oig.hhs.gov/oei/reports/oei-09-95-00090.pdf; Portable Imaging Services: Nursing Home Perspectives (November, 1997); Imaging Services for Nursing Home Patients: Medical Necessity (OIG, August 1997).   The Inspector General concluded, *inter alia*, that only two percent of chest x-rays of nursing home patients were medically necessary; that portable imaging providers were overpaid by tens of millions annually as a result of these arrangements; and that nursing homes could not

explain why they chose to bring in portable x-ray providers rather than transport their patients to hospitals or other locations for non-portable imaging services.

72.     Under PPS, these services provided to Part A patients are covered under the Part A *per diem* and are not billed separately.  Pursuant to the SNF Consolidated Billing requirements that were implemented as a part of the PPS system, the SNF is responsible for including on its submission almost all of the services that a resident receives during the course of its stay, even services billed under arrangement. Medicare's payment to the SNF represents payment in full for arranged-for services and suppliers must look to the SNF (rather than Medicare Part B) for their payment.

73.     Certain services are specifically excluded from SNF consolidated billing. For example, physician services are specifically excluded and are separately billed to CMS via the Part B carrier either by the physician or his assignee.  In this case, the physician fees associated with radiology interpretations were assigned to Mobilex and submitted by them to the carrier.

74.     In addition, Part B services for patients who are not eligible under Part A or who have exhausted Part A benefits (referred to as Part B residents) are also excluded both from SNF PPS and Consolidated Billing.  Services provided to Part B residents may be billed by the SNF or the supplier under an arrangement with the SNF. In this case, portable x-ray services for Part B residents were billed by the supplier to CMS via its Part B carriers.

75.     CMS sets the maximum allowable amounts for covered Part B services through the Medicare Fee Schedule ("MFS").  Portable X-ray services submitted under Part B are reimbursed under the Medicare Fee Schedule.

76.     There are three parts to the payments for portable x-rays services under the MFS.  These are:

   a.     Payment for the particular type of x-ray study performed, according to the proper CPT code;

   b.     Payment for each set-up component per procedure, a "Q" code, which averages approximately $12 per service;

   c.     Payment for the cost associated with transporting the equipment to the place of service, an "R" code, also known as the mobile code.  Code R0070 indicates that one portable x-ray was performed during a mobile visit and R0075 indicates that multiple x-rays were performed, with modifiers to indicate the number of patients serviced.

77.     Defendant nursing home providers have paid and continue to pay Mobilex for services provided to patients with Part A coverage at a rate substantially below the MFS allowance.  In some cases, Mobilex does not require SNF's to pay anything for Part A portable X-ray services.

78.     Mobilex solicits and accepts reduced rates for portable x-ray services as *quid pro quo* for becoming the exclusive provider of portable x-ray services to all patients of the SNF, including the Part B residents.

**B.     Compliance with the Anti-Kickback and Stark laws is a condition of payment under federally-funded healthcare programs**

79.     The Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions will

- 19 -

result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

80.     The Anti-kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid and (as of January 1, 1997) TRICARE programs.  In pertinent part, the statute states:

(b) **Illegal remuneration**

(1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind --

(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any

good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person --

(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to

exclusion from participation in federal health care programs and, effective August 6,

1997, civil monetary penalties of $50,000 per violation and three times the amount of

remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

81. Regulations implementing the Anti-Kickback Act have created certain safe

harbors protecting payments that meet narrow conditions. For example, there is a

regulatory safe harbor that may apply to certain discounts to providers who submit cost

reports as long as they are given at the time of sale in an arms-length transaction; are

fully disclosed by the provider to the United States in the cost report; and are fully and accurately reported by the seller to the provider in a written statement that advises of the provider's obligation to disclose to the United States. Notwithstanding that Relator alleges that such requirements were not met here, this safe harbor specifically does not apply to:

> Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology.

42. C.F.R. § 1001.952(h)(5).

82. Payment of remuneration of any kind violates the statute if one or any purpose for that remuneration was to induce referrals. Moreover, payments to physicians in return for the physicians' promises to send patients to a particular facility qualify as kickbacks. Giving a person the opportunity to earn money may also constitute an inducement under the Anti-kickback statute.

83. In Advisory Opinion No. 99-2 (February 26, 1999), the Department of Health and Human Services Inspector General considered the legality of an "arrangement [in which] Ambulance Company X will charge the Nursing Home fixed per-transport rates for . . . services covered by Medicare Part A . . . [which] represent discounts of up to 50% of the 'reasonable charge' established by Medicare." Under the scheme, "Ambulance Company X will charge Medicare its full usual and customary amount for transporting Nursing Home residents for whom ambulance services are

- 22 -

covered under Medicare Part B." The Inspector General described the arrangement as "swapping" because the parties were "swapping" the "discounts on their . . . Part A business in exchange for profitable non-discounted Part B business." The Inspector General concluded that the "Arrangement does not fit in the safe harbor and may involve illegal remuneration for the . . . referrals of ambulance business not covered by the PPS payment and not subject to the discount."

84.    The Inspector General also noted "reports…that suppliers of a wide range of [nursing home] services are giving [nursing homes] discounts for PPS-covered business that are linked, directly or indirectly, to referrals of Part B business," and stated:

> In evaluating whether an improper nexus exists between a discount and referrals of Federal business in a particular arrangement, we look for indicia that the discount is not commercially reasonable in the absence of other, non-discounted business. In this regard, discounts on SNF PPS business that are particularly suspect include, but are not limited to:
>
> a.    Discounted prices that are below the supplier's cost;
>
> b.    Discounts on PPS-covered business that are coupled with exclusive supplier agreements, and
>
> c.    Discounts on Medicare PPS or other capitated or prospective payment business made in conjunction with explicit or implicit agreements to refer other facility business to the supplier, including Part B or other Federal health care program business.

85.    In a publication titled *Compliance Program Guidance for Nursing Homes*, the Inspector General stated that a kickback violation would likely occur where "suppliers . . . offer a SNF an excessively low price for items or services reimbursed

under PPS in return for the ability to service and bill nursing home residents with Part B coverage." 65 Fed. Reg. 14289, 14298 n. 75.

86.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits an entity providing healthcare items or services from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital. The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

87.     A financial relationship under the Stark laws specifically includes a relationship where the physician has an ownership or investment interest in an entity. 42 U.S.C. § 1395nn(a)(2)(A).

88.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider. Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

89.     In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services (DHS) effective January 1, 1995, including (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies;

- 24 -

(8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services.  42 U.S.C. § 1395nn(h)(6).

90.    Both the professional and technical components of diagnostic radiology services are a designated health service (DHS) under Stark laws.

91.    The Stark statute provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then --

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (emphasis added).

92.    The Stark laws expressly prohibits any entity from presenting or causing the presenting of any claim resulting from a referral from a physician who has a financial relationship with the entity, which includes ownership interests, unless that relationship fits into one of the specific exceptions in the statute.  For example, certain ownership interests in publicly-traded securities and in hospital entities are excepted.

*See* 42 U.S.C. § 1395nn(d).  Such exceptions are not applicable to the allegations in this case.

93.     Compliance with both the Anti-kickback Act and the Stark laws is a condition of payment from federally-funded healthcare programs.

94.     Every Medicare and Medicaid provider or supplier, including as relevant here Mobilex, the defendant physicians, and the defendant facilities, are required to sign a Provider Agreement.  Each entity or person which signs a Provider Agreement certifies:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [this provider/supplier/physician]. The Medicare laws, regulations, and program instructions are available through the [Medicare contractor].

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

95.     Every cost report submitted by defendant providers contains a Certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

96.     For cost reporting periods applicable to the allegations in this case, the responsible provider official for each SNF facility was required to sign the following certification:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW.  FURTHERMORE, IF

SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying [cost report] and that to the best of my knowledge and belief, it is a true, correct  and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2540-96 (capitalization in original).

97.     The discounts provided by Mobilex to the facilities defendants constitute "remuneration" as that term is used in the Anti-Kickback Statute.  These discounted rates are below fair market value and confer a benefit on the provider defendants that is intended to account for the volume or value of federally-funded business referred to Mobilex.

98.     Specifically, Mobilex offers and pays such remuneration in exchange for referrals for Part B portable imaging services.  This scheme is known as "swapping," because Mobilex swaps cut-rate or free Part A portable imaging services for lucrative exclusivity for Part B patients.

99.     This swapping scheme violates the provisions of the Anti-Kickback Statute.  By engaging in this scheme, Mobilex knowingly submits false claims for Part B services obtained pursuant to illegal incentives offered providers through free or deeply discounted Part A services.

100.     Mobilex's scheme does not qualify for safe harbor protection under the Anti-kickback statute. Indeed, a purpose of payment is to induce the referral of business paid under federal health care programs.

101.     Mobilex also causes the providers to submit false claims, including on its annual cost reports, certifying compliance with the laws, including the kickback laws. Defendant providers knowingly submit false claims when they certify their compliance with these laws, notwithstanding that they seek Part A reimbursement for discounted or free Part A services obtained in exchange for the provision of Part B referrals.

102.     Upon information and belief, the defendant providers do not report the discounted or free services received from Mobilex for their Part A patients on their annual cost reports.  Upon information and belief, Mobilex also does not fully and accurately report the discount (or discount program) in writing to the nursing home defendants nor does it advise them of their obligation to report such discounts to the United States on their cost reports. The provider's failure to disclose the payment of illegal remuneration by Mobilex also results in the submission of false claims.

103.     Mobilex contracts with radiologists to interpret x-rays at a discounted fee in exchange for large volumes of referrals.  Mobilex requires the physicians to re-assign their payments so that Mobilex can bill for both the procedures and the interpretations.

104.     Mobilex pays the doctors less than fair market value for their services, and/or charges the physicians for minimal administrative services (that is, the

submission of their claims) amounts substantially in excess of worth.  This fee-splitting scheme allows Mobilex to profit from large volumes of referrals to these radiologists.

105.    Mobilex chief radiologist Jason Liu, M.D. owns 10% of Mobilex Acquisition Group, which owns Mobilex.  Liu is also the owner of Liu Inc. which, upon information and belief, supplies contract radiologists and radiological services to Mobilex.

106.    Liu's ownership interest in these entities constitutes a financial relationship under the Stark laws which does not qualify for any exception.  Under Stark, this financial relationship prohibits the referral of DHS services from Mobilex to Liu Inc. radiologists.  Thus, the resulting claims for those services are expressly prohibited by the Stark and are false claims.  Defendants Mobilex, Liu and Liu Inc. knowingly present or cause to be presented false claims by billing for DHS services referred to the Liu Inc. radiologists.

107.    Mobilex and the radiologists violate the Anti-kickback laws when they pay or receive discounted professional fees in exchange for voluminous referrals of federally-funded healthcare business.  This arrangement does not fall within any safe harbor.  As such, Mobilex and the radiologists knowingly present or cause to be presented false claims for services provided in violation of the Anti-Kickback Statute.

108.    The Medicare Carrier's Manual advises that such arrangements may constitute a violation of the Anti-Kickback Act.  M.C.M., Chapter 13, § 20.2.4.2, Part D., Questionable Business Arrangements.

C.    **Mobilex's Disregard of Corporate Integrity Agreement**

109.    On or about August 28, 2003, Symphony Diagnostic Services, Inc. d/b/a Mobilex entered into a Corporate Integrity Agreement with HHS-OIG as part of a settlement agreement with the United States.  This agreement resulted from prior False Claims Act litigation relating to allegations wholly different from those at issue in this case.

110.    Compliance with the agreement is a condition of Mobilex's participation in federal health care programs.

111.    Symphony promised that it would establish a Compliance Program that would ensure that it complied with all applicable statutes, regulations, policies, and the CIA itself.

112.    The CIA also required a program of internal audit to make findings of whether future claims and submissions to federal healthcare programs are accurate and in compliance with applicable law.

113.    The CIA requires a detailed claims review and an annual report to the OIG with its findings.

114.    The violations of the False Claims Act alleged herein also violate the CIA.

**D.**    **Mobilex's Relationships With Nursing Home Providers are Illegal Swapping Schemes**

115.    Mobilex provides more than half the portable x-rays billed under both Medicare Parts A and B and dominates the field.  It has contracts with national nursing home chains and  with local, smaller nursing homes.

- 30 -

116.    Prior to enactment of the PPS, Mobilex's contracts with nursing homes set up a fee-for-service arrangement pursuant to which Mobilex's bills were submitted to Medicare or Medicaid by the facilities.

117.    PPS destroyed Mobilex's business model, because facilities were directly responsible for Mobilex's services to Part A patients and could no longer pass them through to Medicare.

118.    In an attempt to adjust to the new regulatory environment, Mobilex adopted a new system of marketing and selling its services to patient-care facilities. Mobilex now contracts with patient care facilities to provide, with respect to the facility's Medicare Part A patients, either a per-diem rate for all x-ray services provided or a flat fee per service.  Mobilex's charges under these arrangements are substantially and unreasonably below market value; substantially and unreasonably below MFS; and substantially and unreasonably below Mobilex's cost of providing the services.

119.    As a *qui pro quo*, the facility defendants refer all other patients requiring mobile x-ray services to Mobilex.  Many or most of these patients are Medicare Part B and/or Medicaid.  With respect to these patients, Mobilex directly bills third-party providers, including Medicare and Medicaid programs.

120.    In 2001, Mobilex's actual cost to perform a portable x-ray averaged approximately $96.62.  For Medicare Part A patients, Mobilex's *per diem* rate ranged from $0.45 to $1.00 per patient day and the flat fees ranged from $50.00 to $75.00 per exam.

121.    By 2005, the Medicare Fee Schedule in Ohio, for example, allowed $129.95 for a single-view chest x-ray, including set-up fees, transportation fees, and technical costs.

122.    In addition to the steep discounting of rates for Part A patients, Mobilex regularly chooses not to collect accounts receivable from the nursing homes, effectively providing its Part A services for free.  During Mr. McDonough's tenure, Mobilex's accrued receivables in each region amounted to hundreds of thousands of dollars. Mobilex employees told him that the company had no intention of collecting these sums.

123.    Because the diagnosis-based *per diem* payments they receive from CMS are calculated based on the assumption that x-rays will be medically necessary ancillary services the cost of which they absorb, the facility defendants' arrangements with Mobilex manipulate the PPS system and they realize excessive profit by accepting reduced-cost or free portable x-ray services

124.    Approximately one-third of nursing home patients are covered by Medicare Part A.  In 2006, Mobilex averaged 1.5 portable x-rays per Part A patient stay.

125.    Defendant Manor Care's 100-bed Heartland Bucyrus nursing home in Bucyrus, Ohio entered into a contract with Mobilex in December 2002 in which they agreed to pay Mobilex a *per diem* amount of $0.54 per Part A patient.

126.    Defendant Extendicare entered into a nationwide contract with Mobilex in 1998.  The contract continues to the present.

127.    Accounting documents from Mobilex dated December 11,2002 show that Mobilex charged Extendicare a *per diem* for Part A patients of $0.83 at its "Arbors at Canton" facility in Canton, Ohio.

128.    Similar contracts were made with all of Manor Care's and Extendicare facilities.

129.    In exchange for these reduced rates for Part A work, Manor Care and Extendicare facilities referred all of their non-Part A work to Mobilex.  For all the non-Part A work, Mobilex charged the full Medicare allowable rate, which it billed directly to federal and state health care programs.

130.    On or about January 1, 1999, Beverly Enterprises entered into a contract with Mobilex for the provision of portable x-ray services.  In an addendum dated on or about March 8, 1999, Mobilex confirmed that the rate of reimbursement for Beverly's Medicare Part A patients was 15% lower than the Medicare Fee Schedule allowed. The addendum specifically stated that this rate was conditional upon Beverly's referral of all non-Part A work to Mobilex.

131.    By way of example, Mobilex agreed to provide portable x-ray services to Evergreen Rehab and Care Center in Medina, Ohio, a Beverly facility, at the rate of $55.00 per x-ray, far below the Medicare allowed rate.

132.    Beginning in approximately February 2001, Mobilex lost its Midwest regional contract with Beverly Enterprises to Regional Diagnostics, an Ohio regional portable x-ray.  In 2005 Regional filed for bankruptcy and Mobilex purchased the company.  At the time of the bankruptcy, Regional was charging Beverly's facilities

$75.00 per exam for Part A patients, regardless of cost. Mobilex continued the $75.00 rate.

133. Similar arrangements were made with each of the Nursing Home defendants. All of the contracts provided for a below-cost fee for Medicare Part A patients in exchange for referral of all other patients. Examples of contracts with the Nursing Home defendants include:

| Parent Co. | Regional facility | Accounting Date | Fee |
|---|---|---|---|
| Manor Care | Westerville | Dec. 2002 | $0.60 *per diem* |
| Extendicare | Arbors West | Dec. 2002 | $0.73 *per diem* |
| Kindred | LakeMed | Dec. 2002 | $0.60 *per diem* |
| Kindred | Logan | Dec. 2002 | $0.95 *per diem* |
| LCCA | Elryia | Dec. 2002 | $1.40 *per diem* |
| LCCA | Wayne, IN | Dec. 2002 | $0.79 *per diem* |
| Covenant Care | Villa Springfield | Dec. 2002 | $0.60 *per diem* |
| Sun | Harborside Troy | Dec. 2002 | $0.45 *per diem* |
| Sun | SunBridge, New Lexington | Dec. 2002 | $0.65 *per diem* |

134. On information and belief, the Defendant nursing homes did not report in their annual cost reports the receipt of remuneration from Mobilex in the form of reduced rates or free rates for portable x-ray services.

135. Payments for portable x-ray procedures under Medicare Part B coverage are huge. In 2003, Medicare paid $103,101,106 under the R0070 code for 942,117 visits and $19,512,567 under the R0075 code for 420,218 multiple service visits.

136. In 2004, under Part B, Medicare paid $114,832,268 under the R0070 code for 968,365 visits and $22,967,953 under the R0075 code for 443,502 multiple service visits.

- 34 -

137.    In 2006, under Part B, Medicare paid $123,301,065 under the R0070 code for 1,003, 629 visits and $23,824,740 under the R0075 code for 455,776 visits.

138.    Part B payments for the setting-up (Code Q0092) of portable x-ray procedures are also huge.  In 2003, Medicare paid $19,455,608 under the Q0092 code. In 2004, Medicare paid $20,470,129 under the Q0092 code.  In 2005, Medicare paid $23,824,740 under the Q0092 code. .

139.    William Glynn, CEO of Mobilex, was aware of the schemes alleged herein and discussed them with Mr. McDonough or otherwise referred to them on a number of occasions, including the following:

    a.    November 2005 Atlantic region sales meeting;

    b.    January 19, 2006 conference call in which Glynn reminded employees to keep patient numbers up because *per diem* payments were directly related to the number of Part A patient days per facility;

    c.    March 8, 2006 meeting with Relator McDonough in a Columbus, Ohio,  Radisson hotel, during which Glynn stated that "you can't negotiate with clients you don't have....Sooner or later, we will try to negotiate with them to rates that are compliant [with Medicare rules and regulations]."

140.    When asked by McDonough at the March 8, 2006 meeting to stop offering discounted PPS Part A rates, or to fight the nationwide abuse of the PPS system by exposing the practices described herein, Glynn stated that he "did not want to do that, and [his] partners would not let [him]." Glynn further stated that "I do not want you [McDonough] to do that either."

141.    Debbie Begg, Mobilex MidWest Region Marketing manager, advised Mr. McDonough that many nursing homes had not paid their Part A bills.  Ms. Begg stated in June 2006 that Saber Management owed Mobilex $250,000.

142.    Similar admissions were also made by other Mobilex employees.  For example, Lisa Curry, a billing employee of Mobilex in Sparks, MD told McDonough on October 18, 2005, that the PPS Part A rates were significantly less than the MFS; on October 19, 2005, Michelle Massey, senior supervisor of the Mobilex Facility Collection Team in Sparks, showed McDonough the large outstanding accounts receivable.

### E.    Mobilex's Relationships with Physicians: Illegal Kickbacks and Substandard Care

143.    The radiologists who perform radiological readings for defendant Mobilex (defendant Liu, defendant Lanese, and defendant Liu, Inc.),  are contractors of defendant Mobilex.

144.    These radiologists are entitled under Medicare Part B to bill Medicare directly for the performance of radiology interpretations.  However, they assign their right to billing to defendant Mobilex.  This process, of the assignment of the right to bill, is acceptable practice under federal and state programs as long as it does not result in other questionable business arrangements in violation of federal laws.

145.    Under this assignment, Defendant Mobilex bills Medicare Part B, Medicaid, Tricare, Veterans' Administration, FEHBP, and private insurance companies for the services performed by defendant Lanese, defendant Liu, and defendant Liu,

- 36 -

Inc., for both the technical component and the professional interpretation component. This is called "billing without a modifier," and is known as "global billing."

146.   This act by defendant Mobilex permits Mobilex to collect the professional fee and the technical fee, and then pay the radiologists (defendants Liu, Lanese, and Liu, Inc.) for only the professional component.

147.   Defendant Mobilex performs approximately 5,000 portable x-rays per day nationwide, as of January, 2006.   Approximately 3,000 of these mobile x-rays are performed daily in defendant Mobilex's MidWest region.  This number was confirmed by defendant Glynn to Mr. McDonough by way of a conference call on or about January 15, 2006.

148.   During the time that Mr. McDonough was employed by defendant Mobilex, defendant Mobilex only employed  two radiologists to read these films in the MidWest region.  Therefore, in the MidWest region, defendants Lanese and Liu performed approximately 1,500 radiological readings per day.

149.   Upon information and belief, Defendant Mobilex's contract with defendants Liu, Liu Inc., and Lanese made them the exclusive provider of radiology services to defendant Mobilex.

150.   The usual and customary payment for the professional component of the radiologists' services under the MFS (identified by the "26" modifier when billed; this modifier is absent when billed globally) ranges from $10 to $12 per procedure.  For every x-ray read by defendants Lanese, Liu, and/or defendant Liu, Inc., defendant

Mobilex pays defendants Lanese, Liu and Liu Inc., approximately $6 per reading; and keeps (fee splits) approximately $ 4 to $6 per reading.

151.    The payment of $6 for professional radiology services per x-ray study read is far below the usual and customary rate for radiologists, averaging half the amount paid radiologists who accept assignment under  the MFS.

152.    The aggregate compensation paid to defendants Lanese and Liu was not consistent with fair market value.  Rather, their compensation was determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid, or other federal programs.

153.    In exchange for deeply-discounted fee for radiology interpretations, defendant Mobilex exclusively refers large volumes of work to defendants Liu, Liu Inc, and Lanese.

154.    In late 2005, Mr. McDonough uncovered evidence of two patients in Ohio who had died as a result of misreadings by defendants Lanese or Liu and/or defendant Liu Inc.  One patient had a fracture of cervical spine at the level of C-7, and died.  One patient had a fractured femur, and died from his injuries.  During the time of Mr. McDonough's employment with defendant Mobilex, other patients died as a result of misidentified x-ray results.

155.    When these misreadings leading to deaths were brought to the attention of defendant Glynn, he said that such errors were only "one half of one percent" and therefore insignificant.

156.   Mr. McDonough repeatedly sought to hire more radiologists because he knew that the excessive number of readings per physician leads to increased frequency of errors.  Glynn refused these requests.

157.   No radiologist quality assurance or M.D. Peer Review is performed on the work product of defendants Lanese, Liu, or Liu Inc..  This violates Mobilex's published quality review policies.

158.   American College of Radiology and industry standards require an ongoing process of  peer review and quality assurance to review the work of radiologists and reduce errors.  No such actual process exists at defendant Mobilex; or with defendants Lanese, Liu, or Liu Inc., despite the existence of a written policy at Mobilex.

159.   Defendants Lanese, Liu, and Liu Inc.'s  performance of 3,000 radiologic reviews per day is a blatant violation of the accepted standard of care in any radiology organization.

160.   In order to seek payment under federal programs, Defendants Lanese, Liu, and Liu Inc. are required to assure that radiological services rendered are medically appropriate and of a quality which meets professionally recognized standards of healthcare.  The performance of 3,000 radiologic reviews daily is not within acceptable medical standards for the performance of radiology.

161.   McDonough notified CEO Glynn about the substandard care issues regarding the absence of radiological peer review of x-rays studies in late January, 2006, when Glynn was in Mobilex's Columbus, Ohio office.

### F.      Mobilex's Profiteering Also Results in Substandard Performance of the Technical Component of its X-ray Services

162.    Defendant Mobilex fails to perform adequate quality assurance or quality control on its machines and technical component of its  x-ray services.

163.    For instance, defendant Mobilex has two engineers in its Horsham, PA, office to maintain its entire, nationwide fleet of portable x-ray machines located throughout thirty (30) states.

164.    On January 8, 2006, Mr. McDonough personally witnessed a Sterne Medical x-ray machine, used by defendant Mobilex employees, that had been so misused that the metal screws, which previously held the machine together, had backed out of the machine due to vibration.  This machine was being used to x-ray a patient when it was removed from service.  No defendant Mobilex employee checked or tightened the machine screws or removed the offending machine when the screws began to loosen.  Upon inspection by Mr. McDonough, the entire x-ray machine chassis broke apart.

165.    Defendant Mobilex fails to do quality control or quality assurance on the chemicals used to develop their portable x-ray examinations.

166.    Radiological exams are controlled by the chemical activity necessary to develop the film to form the image.  If these chemical activities are not monitored properly, the radiograph performed is of no value, as it is inaccurate and the image is degraded, making the accuracy questionable.

- 40 -

167.    Two factors control the chemical component of radiological activity: the temperature of the room where the films are developed and the concentration and temperature of the chemicals used in the process.

168.    Simple logging of temperature of the processing machinery and the processing chemicals is the most effective manner of insuring accurate and consistent production of radiographic images.  The processing machinery and processing chemicals must be kept at an appropriate, constant temperature at all times, whether while in use or in storage, such as in a vehicle.

169.    Defendant Mobilex does not use any type of logging procedure to oversee or check the temperature of the machinery or the chemicals used to produce radiographic images.  Defendant Mobilex does not provide its employees with any instruments for temperature monitoring at its many sites.  Therefore, defendant Mobilex, by and through its employees, does not monitor temperature of processing machinery and processing chemicals in any way.

170.    The concentration of the chemicals used to produce radiographic images must be kept at a constant level in order to insure accurate results of x-ray exams.  The concentration can be changed by the addition of either developer or fixer, to change the percentage of the concentration.  If the percentage  of the chemicals is not monitored and replenished at a constant level, the x-rays produced may be degraded and become either inaccurate or of unknown accuracy.

171.    In order to determine the exact ratio of chemicals necessary for the x-ray image production, chemical monitoring must be performed.  Mechanical pumps monitor

the exact ratio of the chemicals, and determine the levels of the chemicals and the need for replenishment.

172.    Defendant Mobilex does not monitor the concentration of the chemicals used to perform radiological exams, whether through the use of pumps or other means. Defendant Mobilex does not keep logs of the amounts of chemicals used to produce the radiographic images.

173.    Rooms where the processing machines develop x-ray films need to be vented in order to remove the exhaust from the machines, and to decrease the temperatures of the chemicals.

174.    Defendant Mobilex does not properly vent the rooms where images are processed, causing the rooms and processing machinery to overheat, and allowing excessive heating of the chemicals used in the process.  This excessive heat leads to images that are either inaccurate or of unknown accuracy.

175.    No quality control or quality assurance programs exist to rectify this situation.

176.    As a result of these problems, each and every x-ray image produced by defendant Mobilex is of decreased value, is a substandard product, and is worth less than the value paid by the Government.

177.    Upon information and belief, this deliberate disregard of quality control and quality assurance results in the provision of worthless services paid by federally-funded health care programs.

178.    Mobilex knowingly submits or causes the submission of false claims when it presents claims for services that are worthless or that vastly disregard the standard of care paid for by the United States.

**G.    Mobilex's Illegal Upcoding of Single View Chest X-Rays**

179.    On or about May 1, 2006, Rick Pulcrano became Senior Vice President and Chief Operating Officer of defendant Mobilex.

180.    In August, 2006, Mr. Pulcrano instituted a program to increase the number of  two view chest x-rays (HCPCS Code 71020) performed by defendant Mobilex.

181.    Chest x-rays are frequently performed on a portable basis to detect conditions such as pneumonia that occur frequently in the elderly population.  Upon information and belief, fifty five percent (55%) of all mobile x-rays performed are chest x-rays.

182.    When nursing-home physicians order single view chest x-rays (HCPCS Code 71010) of their patients, nursing home personnel telephone those orders to Mobilex's call centers to secure dispatch of a mobile x-ray unit.

183.    Mobilex's operators are instructed to enter these orders as two view chest x-rays (71020).

184.    Two view chest x-rays (71020)  are then performed by employees of defendant Mobilex, despite the single-view exam ordered by the patient's physician.

185.    Medicare, Medicaid, Tricare, Champus, FEHBP, Veterans' Administration, and other insurers are then charged for the two view chest x-ray (71020) despite the

fact that the physician's order specifically stated that a single view chest x-ray (71010) was ordered.

186.    The provision and charging for these upcoded services is done without the physician's knowledge and consent.

187.    Section 1862(a)(1)(a) of the Social Security Act provides that payment cannot be made for such services.  Payment is only allowable for services that are reasonable and necessary.  Tests not ordered by the treating physician are specifically excluded from what is considered reasonable and necessary under federal healthcare programs.

188.    Specifically, the Code of Federal Regulations provides that all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is the physician who furnished the consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32 (a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

189.    Independent diagnostic testing facilities (IDTF) may only perform procedures specifically ordered in writing by the physician that is treating the beneficiary.  42 C.F.R. § 410.33 (d).  "The IDTF may not add any procedures based on internal protocols without a written order from the treating physician."  *Id.*

190.    Notwithstanding these specific conditions of payment, Mobilex sought and obtained payment for services not ordered by the physician.

191.    Mobilex's illegal scheme resulted in substantial inflated payments.

- 44 -

192.    Under the 2005 Ohio MFS, for example, a single view chest x-ray (71010) paid $17.45; addition of the Q code (Q0092) and the mobile fee (R0070) raised this procedure to a total fee payable of $129.95 under the MFS.

193.    Under the 2005 Ohio MFS, a two view chest x-ray paid $23.52, a difference of $6.07.  This additional inflated payment over the entire network of 30 states serviced by defendant Mobilex equates to significant additional compensation to which Mobilex is not entitled.

194.    On August 22, 2006, after Relator McDonough had voiced objections to this practice, Mr. Pulcrano sent him a copy of a written statement from a Mobilex-contracted radiologist, documenting the improved readings obtained from performing a two view chest x-ray instead of a single view chest x-ray.  However, no explanation was provided for the provision of services without a physician's order, a condition of payment under federally-funded healthcare programs.

195.    Changing physician orders from single view (71010)  to two-view (71020) chest x-ray is illegal.

196.    For portable x-ray companies like Mobilex, chest x-rays (most commonly ordered as single view chest x-rays, 71010) account for 55% of typical annual exam volume.  Based on defendant Glynn's assertion that Mobilex performs 3,000 mobile x-rays per day in the Midwest region and 50% of that daily volume constitutes the orders for single view chest x-ray, Mobilex's upcoding increases revenues by about $9,105 per day, or more than $2.7 million per year in the region.

- 45 -

197.    Mr. McDonough was advised that this upcoding practice occurred nationwide.

198.    The architect of the two-view upcoding prctice is Mobilex Senior Vice President Pulcrano.

199.    Mr. McDonough confronted Mobilex officer Anthony Zingarelli, in November, 2006, at the Sheraton Hotel in Maitland, FL, with this illegal upcoding activity.  Defendant Zingarelli advised that"when I found out this was going on, I stopped it" and said "that (expletive) Pulcrano almost lost his job over that one."

200.    The next day, Theresa Heidemann, marketing representative for defendant Mobilex in Canton-Akron, Ohio, called Mr. McDonough to ask questions about recent activities in Ohio, not knowing that Mr. McDonough no longer worked for defendant Mobilex.  Mr. McDonough inquired as to the progress of the two view chest x-ray, and Ms. Heidemann confirmed that the program was still underway.

201.    Mobilex's upcoding scheme results in the knowing submission of false claims to the United States.

202.    Mobilex's upcoding scheme violates its existing CIA with the United States.

**COUNT I**
**DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729 (a)(1) and (a)(2)**

203.    The allegations of ¶¶ 1-203 are incorporated as if rewritten.

204.    Defendant Mobilex, by and through its officers, directors, parents and subsidiaries, and other affiliated companies, including ZAC Management (hereinafter

referred to collectively as "Defendant Mobilex"), knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients unlawfully referred to Mobilex by nursing homes to whom Mobilex provided kickbacks and/or illegal remuneration in violation of the Anti-kickback laws.

205.   Defendant Mobilex also knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States for Part B services provided pursuant to an illegal fee-splitting arrangement with physician radiologists in violation of Anti-kickback and Stark laws.  This referral relationship also resulted in false claims for the non-allowable costs of services performed in violation of medically-accepted standard of care, and caused patient harm.

206.   Defendants HCRMC, Extendicare, Beverly, Kindred, LCCA, Covenant, and HHC/Sun (hereinafter collectively referred to as "defendant nursing home providers") knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients unlawfully referred to Mobilex for Part A and Part B services in exchange for kickbacks and/or illegal remuneration in violation of the Anti-kickback laws.  Upon information and belief, Defendant nursing homes additionally falsified their claims by failing to disclose the deeply discounted Part A fees on their annual cost reports.

207.   Defendants Liu, Lanese, and Liu, Inc. (hereinafter collectively referred to as defendant physician radiologists) also knowingly presented or caused to be

presented false or fraudulent claims for payment or approval to the United States for Part B services provided pursuant to an illegal fee-splitting arrangement with Mobilex in exchange for the opportunity to bill additional Part B services in violation of the Anti-kickback and Stark laws.  This referral relationship also resulted in false claims for the non-allowable costs of services performed in violation of medically-accepted standard of care, and caused patient harm.

208.    Defendant Mobilex also knowingly presented false claims for illegally upcoded chest x-rays provided without a physician's order.

209.    Each of defendants' actions were with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information submitted to the United States.

210.    Defendants also knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

211.    Defendants knowingly created false records or statements that have concealed or failed to disclose the occurrence of events that materially affect their continued rights to receive Medicare and Medicaid funds, including their participation in kickback schemes.

212.    By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT II**
**DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT**
**UNDER 31 U.S.C. SECTION 3729 (a)(3)**

213.    The allegations of ¶¶ 1-212 are incorporated as if rewritten.

214.    Defendant Mobilex knowingly conspired with the nursing home defendants to get false or fraudulent claims paid or approved.

215.    Such conspiracy, on the part of these defendants, includes the overt agreement on a reduced below-market rate for the performance of Part A mobile x-rays, in exchange for the exclusive referral of all other mobile x-ray work.

216.    Defendant Mobilex also knowingly conspired with defendant physician radiologists to get a false claim paid or approved.

217.    Such conspiracy, on the part of these defendants, includes the overt agreement to discounted, below-market fees for physician interpretations in exchange for referrals of large volumes of additional Part B business.

218.    By virtue of this conspiracy, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT III**
**DEFENDANT MOBILEX'S VIOLATION OF THE FALSE CLAIMS ACT'S**
**PROHIBITION AGAINST RETALIATION, 31 U.S.C. §3730 (h)**

219.    The allegations of ¶¶ 1-218 are incorporated as if rewritten.

220.    Kevin McDonough was hired by defendant Mobilex on or about October 1, 2006.

- 49 -

221.    Mr. McDonough's job at defendant Mobilex was multi-faceted.  Mr. McDonough was to assist the MidWest office of defendant Mobilex; to assist the opening of the SouthEast office of defendant Mobilex; and to provide assistance to defendant Glynn as requested.

222.    As a result of this job, Mr. McDonough was in contact with Mobilex's CEO Glynn on a regular basis.

223.    Mr. McDonough immediately became aware of the schemes alleged above.

224.    As alleged above, Mr. McDonough alerted Mr. Glynn and other officers and managers to these illegal practices.

225.    Mr. Glynn and other Mobilex managers acknowledged the practices, but refused to take any actions to rectify the situation.

226.    Mr. McDonough also attempted to rectify the situation created by having a small number of radiologists reading a large number of x-rays.  Mr. McDonough contacted a large medical publisher about placing advertisements for additional radiologists and ultrasound technologists.  However, CEO Glynn refused to hire additional personnel to rectify the situation.

227.    As a result of his objections to these practices, Mr. McDonough was fired.

228.    The sole reason for Mr. McDonough's firing was in retaliation for the lawful acts of Mr. McDonough in furtherance of an action under the False Claims Act.

229.    Mr. McDonough has been unable to obtain employment in the field of mobile x-ray as a result of his termination.

230.    As a result of defendant Mobilex's actions, Mr. McDonough was harmed.

### COUNT IV
### DEFENDANTS' VIOLATION OF THE ILLINOIS WHISTLEBLOWER
### REWARD AND PROTECTION ACT
### 740 ILCS 175 §3 (a)

231.    The allegations of ¶¶ 1-230 are incorporated as if rewritten.

232.    Defendants have knowingly presented, or cause to be presented, to the State of Illinois, false and fraudulent claims for payment or approval in violation of 740 ILCS 175 §3 (a)(1) .

233.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

234.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Illinois.

235.    Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records  to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175 §3 (a)(2) .

236.    Defendant Mobilex conspired with all of the other defendants to get a false or fraudulent claim allowed or paid by the state of Illinois, by entering into overt

agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of 740 ILCS 175 §3 (a)(3) .

237.    As a result of these false submissions, the state of Illinois paid money to the defendants.

238.    As a result of these false submissions, the state of Illinois, by and through its Medicaid program, has been damaged.

## COUNT V
## DEFENDANTS' VIOLATION OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT, DEL. CODE ANN. TITLE 6, §1201(a)

239.    The allegations of ¶¶ 1-238 are incorporated as if rewritten.

240.    Defendants have knowingly presented, or cause to be presented, to the State of Delaware, false and fraudulent claims for payment or approval in violation of Del. Code Ann. Title 6, § 1201(a)(1) .

241.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

242.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Delaware.

243.    Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records  to get false or fraudulent claims paid or approved by the State of Delaware in violation of Del. Code Ann. Title 6, § 1201(a)(2) .

244.    Defendant Mobilex conspired with all of the other defendants to get a false or fraudulent claim allowed or paid by the state of Delaware, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of Del. Code Ann. Title 6, § 1201(a)(3) .

245.    As a result of these false submissions, the state of Delaware paid money to the defendants.

246.    As a result of these false submissions, the state of Delaware, by and through its Medicaid program, has been damaged.

## COUNT VI
## DEFENDANTS' VIOLATIONS OF THE MASSACHUSETTS FALSE CLAIMS LAW
## PART I, TITLE II, CHAPTER 13, §5 B

247.    The allegations of ¶¶ 1-246 are incorporated as if rewritten.

248.    Defendants have knowingly presented, or cause to be presented, to the State of Massachusetts, false and fraudulent claims for payment or approval in violation of Part I, Title II, Chapter 13, §5 B(1) .

249.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

250.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Massachusetts.

251.    Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records  to get false or fraudulent claims paid or approved by the State of Massachusetts in violation of Part I, Title II, Chapter 13, §5 B(2) .

252.    Defendant Mobilex conspired with all of the other defendants to get a false or fraudulent claim allowed or paid by the state of Massachusetts, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of Part I, Title II, Chapter 13, §5 B(3) .

253.    As a result of these false submissions, the state of Massachusetts paid money to the defendants.

254.    As a result of these false submissions, the state of Massachusetts, by and through its Medicaid program, has been damaged.

### COUNT VII
### DEFENDANTS' VIOLATIONS OF
### VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### VA. CODE ANN. §801.216.3 (a)

255.    The allegations of ¶¶ 1-254 are incorporated as if rewritten.

256.    Defendants have knowingly presented, or cause to be presented, to the State of Virginia, false and fraudulent claims for payment or approval in violation of Va. Code Ann. §801.216.3(a)(1) .

- 54 -

257.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

258.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Virginia.

259.    Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records  to get false or fraudulent claims paid or approved by the State of Virginia in violation of Va. Code Ann. §801.216.3(a)(2) .

260.    Defendant Mobilex conspired with all of the other defendants to get a false or fraudulent claim allowed or paid by the state of Virginia, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of Va. Code Ann. §801.216.3(a)(3) .

261.    As a result of these false submissions, the state of Virginia paid money to the defendants.

262.    As a result of these false submissions, the state of Virginia, by and through its Medicaid program, has been damaged.

## COUNT VIII
## DEFENDANTS' VIOLATIONS OF THE INDIANA FALSE CLAIMS
## AND WHISTLEBLOWER PROTECTION ACT
## 2005 IND. HEA 1501, §23 IC 5-11-5.5 § 2(B)

263. The allegations of ¶¶ 1-262 are incorporated as if rewritten.

264. Defendants have knowingly presented, or cause to be presented, to the
State of Indiana, false and fraudulent claims for payment or approval in violation of
2005 IND. HEA 1501, §23 IC 5-11-5.5 § 2(B)(1) .

265. Such submissions, as alleged above, include false submissions related to
illegal kickback schemes; false submissions for reimbursement for services which were
substandard, worthless, or not provided within a medically acceptable standard of care;
and false submissions for upcoded services.

266. Such submissions concealed or failed to disclose the occurrence of
events that materially affect the defendants' continued rights to receive funds from the
State of Indiana.

267. Defendants also knowingly made, used, or caused to be made or used,
false or fraudulent records  to get false or fraudulent claims paid or approved by the
State of Indiana in violation of 2005 IND. HEA 1501, §23 IC 5-11-5.5 § 2(B)(2).

268. Defendant Mobilex conspired with all of the other defendants to make or
use, and to present, false claims to be paid or approved by the state of Indiana, by
entering into overt agreements for the referral of federally-funded healthcare business
in exchange for below-market discounts, in violation of 2005 IND. HEA 1501, §23 IC 5-
11-5.5 § 2(B)(7).

- 56 -

269.    By devising illegal kickback schemes to swap discounted rates or fees for referral of patient services, Defendant Mobilex caused or induced all other defendants to perform an act, that is, present false claims, and makes or use false records, in order to obtain payment or approval from the state of Indiana, in violation of 2005 IND. HEA 1501, §23 IC 5-11-5.5 § 2(B)(8).

270.    As a result of these false submissions, the state of Indiana paid money to the defendants.

271.    As a result of these false submissions, the state of Indiana, by and through its Medicaid program, has been damaged.

### COUNT IX
### DEFENDANTS' VIOLATIONS OF THE NEW YORK  FALSE CLAIMS ACT
### NY FINANCE LAWS, §189 (1)

272.    The allegations of ¶¶ 1-271 are incorporated as if rewritten.

273.    Defendants have knowingly presented, or cause to be presented, to the State of New York, false and fraudulent claims for payment or approval in violation of NY Finance Laws, §189(1)(a) .

274.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

275.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of New York.

276.    Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records  to get false or fraudulent claims paid or approved by the State of New York in violation of NY Finance Laws, §189(1)(b).

277.    Defendant Mobilex conspired with all of the other defendants to make or use, and to present, false claims to be paid or approved by the state of New York, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of NY Finance Laws, §189(1)(c).

278.    As a result of these false submissions, the state of New York paid money to the defendants.

279.    As a result of these false submissions, the state of New York, by and through its Medicaid program, has been damaged.

### COUNT X
### DEFENDANTS' VIOLATIONS OF THE NEW MEXICO FRAUD AGAINST TAXPAYERS ACT, N.M. STAT ANN. §44-9-3 AND THE NEW MEXICO MEDICAID FALSE CLAIMS ACT, N.M. STAT. ANN. § 27-14-4

280.    The allegations of ¶¶ 1-279 are incorporated as if rewritten.

281.    Defendants have presented, or cause to be presented, to the State of New Mexico, false and fraudulent claims for payment or approval knowing such claims to be false and knowing that the entities receiving Medicaid payments are not authorized for those payments nor eligible under the Medicaid program because of their illegal false schemes, in violation of the New Mexico Medicaid False Claims Act, N.M Stat. Ann. § 27-14-4(A), (B) and the Fraud Against Taxpayers Act, N.M. Stat. Ann. § 44-9-3(A)(1).

- 58 -

282.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

283.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of New Mexico.

284.    Defendants also knowingly made or used, or caused to be made or used, false, misleading, or fraudulent records or statements to obtain payment or support the approval or payment on a false or fraudulent claim to the state of New Mexico in violation of the New Mexico Medicaid False Claims Act, N.M Stat. Ann. § 27-14-4 (C) and the Fraud Against Taxpayers Act, N.M Stat. Ann. § 44-9-3(A)(2).

285.    Defendant Mobilex conspired with all of the other defendants to make or use, and to present, false claims to be paid or approved by the state of New Mexico, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of the New Mexico Medicaid False Claims Act, N.M Stat. Ann. § 27-14-4(D) and the Fraud Against Taxpayers Act, N.M Stat. Ann. § 44-9-3(A)(3).

286.    As a result of these false submissions, the state of New Mexico paid money to the defendants.

287.    As a result of these false submissions, the state of New Mexico, by and through its Medicaid program, has been damaged.

**COUNT XI**
**DEFENDANTS' VIOLATIONS OF THE RHODE ISLAND STATE**
**FALSE CLAIMS ACT, TITLE 9, CH 1.1, §9-1,1-3(a)**

288.    The allegations of ¶¶ 1-287 are incorporated as if rewritten.

289.    Defendants have knowingly presented, or cause to be presented, to the

State of Rhode Island, false and fraudulent claims for payment or approval in violation

of the Rhode Island State False Claims Act, Title 9, Ch 1.1, §9-1,1-3(a)(1).

290.    Such submissions, as alleged above, include false submissions related to

illegal kickback schemes; false submissions for reimbursement for services which were

substandard, worthless, or not provided within a medically acceptable standard of care;

and false submissions for upcoded services.

291.    Such submissions concealed or failed to disclose the occurrence of

events that materially affect the defendants' continued rights to receive funds from the

State of Rhode Island.

292.    Defendants also knowingly made or used, or caused to be made or used,

false or fraudulent records or statements to get a false or fraudulent claim paid or

approved by the state of Rhode Island in violation of the Rhode Island State False

Claims Act, Title 9, Ch 1.1, §9-1,1-3(a)(2).

293.    Defendant Mobilex conspired with all of the other defendants to make or

use, and to present, false claims to be paid or approved by the state of Rhode Island,

by entering into overt agreements for the referral of federally-funded healthcare

business in exchange for below-market discounts, in violation of the Rhode Island State

False Claims Act, Title 9, Ch 1.1, §9-1,1-3(a)(3).

294.    As a result of these false submissions, the state of Rhode Island paid money to the defendants.

295.    As a result of these false submissions, the state of Rhode Island, by and through its Medicaid program, has been damaged.

## COUNT XII
## DEFENDANTS' VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE §36.002

296.    The allegations of ¶¶ 1-295 are incorporated as if rewritten.

297.    Defendants have knowingly presented, or cause to be presented, to the State of Texas, false and fraudulent claims for payment or approval in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(1).

298.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

299.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Texas.

300.    Defendants also knowingly or intentionally concealed or failed to disclose to the Texas Medicaid program,  the existence of kickbacks, remuneration in exchange for referrals, in its application for reimbursement from the Texas Medicaid program in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(2)(A).

301.   Defendants also knowingly or intentionally concealed or failed to disclose an event, to permit the defendants to receive a benefit or payment that is not authorized or that is greater than the payment or benefits that were authorized in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(2)(B). For example, Defendants failed to disclose the existence of kickbacks, that permitted these defendants to receive a benefit, participation, and a payment, reimbursement, that is not authorized or that is greater than the payments or benefits that were authorized, such as exclusion. Defendant Mobilex also failed to disclose the existence of upcoding, and substandard care, that permitted defendant Mobilex to receive a benefit and payment, that is greater than the payments or benefits that were authorized.

302.   Defendants knowingly or intentionally made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Texas Medicaid program in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(4)(B).

303.   Defendants knowingly or intentionally charge, solicit, accept, and/or receive, in addition to the amount paid under the Medicaid program, a gift, money, donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient, the cost of which is paid for, in whole or in part, under the Medicaid program.  Defendants have no authorization for their acts

under the Medicaid program and are acting in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(5).

304.   Defendant Mobilex knowingly or intentionally made and makes a claim under the Medicaid program for a service that has not been approved or acquiesced in by a treating physician or health care practitioner in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(7), to wit, the upcoding of single view chest x-rays to two view chest x-rays without obtaining the consent of the treating physician or a health care practitioner.

305.   Defendants also knowingly or intentionally made a claim under the Medicaid program in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(7) for a service that is substantially inadequate or inappropriate when compared to generally accepted standards within the particular discipline or within the health care industry; to wit, substandard radiographic images and readings.

306.   Defendant Mobilex knowingly or intentionally entered into an agreement with all other defendants to defraud the State of Texas by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(8) when it devised illegal kickback schemes to generate referrals of additional Medicaid business.

307.   As a result of these false submissions, the state of Texas paid money to the defendants.

308.    As a result of these false submissions, the state of Texas, by and through its Medicaid program, has been damaged.

## COUNT XIII
## DEFENDANTS' VIOLATIONS OF THE NEW HAMPSHIRE HEALTH CARE FALSE CLAIMS LAW, 2004 N.H. ADV.LEGIS.SERV. §167:61-b-1

309.    The allegations of ¶¶ 1-308 are incorporated as if rewritten.

310.    Defendants have knowingly presented, or cause to be presented, to the State of New Hampshire, false and fraudulent claims for payment or approval in violation of the New Hampshire Health Care False Claims Law, 2004 N.H. Adv. Legis. Serv. §167:61-b-1(a).

311.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

312.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of New Hampshire.

313.    Defendants also knowingly made or used, or caused to be made or used, false or fraudulent records or statements to get a false or fraudulent claim paid or approved by the state of New Hampshire in violation of the New Hampshire Health Care False Claims Law, 2004 N.H. Adv. Legis. Serv. §167:61-b-1(b).

314.    Defendant Mobilex conspired with all of the other defendants to make or use, and to present, false claims to be paid or approved by the state of New Hampshire, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of the Rhode Island State False Claims Act, Title 9, Ch 1.1, §9-1,1-3(c).

315.    As a result of these false submissions, the state of New Hampshire paid money to the defendants.

316.    As a result of these false submissions, the state of New Hampshire, by and through its Medicaid program, has been damaged.

## COUNT XIV
## DEFENDANTS' VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIM ACT MICH. COMPILED LAWS, SECTIONS 400.603, .604, .606, and .607

317.    The allegations of ¶¶ 1-316 are incorporated as if rewritten.

318.    Defendants have made, presented, or caused to be made or presented, to the state of Michigan, claims to the Medicaid program, knowing the claim to be false in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.607.

319.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

- 65 -

320.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Michigan.

321.    Upon information and belief, Defendants knowingly made, or cause to be made, a false statement or false representation of material fact in their application for Medicaid benefits in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.603(1), by falsely certifying that it would comply with applicable laws and regulations.

322.    Defendants also knowingly made, or cause to be made, a false statement or false representation of material fact for use in determining their rights to a Medicaid benefit in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.603(2).

323.    As a result of their ongoing participation in kickback and/or overbilling schemes, Defendants have knowledge of the occurrence of an event affecting their initial or continued rights to receive a Medicaid benefit, and have concealed, or failed to disclose, that event with the intent to obtain a benefit to which the defendants are not entitled in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.603(3).

324.    Moreover, Defendants continue to present or cause to present claims to the State of Michigan notwithstanding that they have solicited, offered, and/or received a kickback in connection with the furnishing of services for which payment is or may be

made in whole or in part pursuant to the Michigan Medicaid program in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.604.

325.    Defendant Mobilex conspired with all of the other defendants to make or use, and to present, false claims to be paid or approved by the state of Michigan, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.606.

326.    As a result of these false submissions, the state of Michigan paid money to the defendants.

327.    As a result of these false submissions, the state of Michigan, by and through its Medicaid program, has been damaged.

### COUNT XV
### DEFENDANTS' VIOLATIONS OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT, OFFICIAL CODE OF GEORGIA, ANN., 49-4-168:1(a)

328.    The allegations of ¶¶ 1-327 are incorporated as if rewritten.

329.    Defendants have knowingly presented, or cause to be presented, to the State of Georgia, false and fraudulent claims for payment or approval in violation of the Georgia State False Medicaid Claims Act, Official Code of Georgia, Ann. 49-4-168:1(a)(1).

330.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

331.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Georgia.

332.    Defendants also knowingly made or used, or caused to be made or used, false or fraudulent records or statements to get a false or fraudulent claim paid or approved by the state of Georgia in violation of the Georgia State False Medicaid Claims Act, Official Code of Georgia, Ann. 49-4-168:1(a)(2).

333.    Defendant Mobilex conspired with all of the other defendants to make or use, and to present, false claims to be paid or approved by the state of Georgia, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of the Georgia State False Medicaid Claims Act, Official Code of Georgia, Ann. 49-4-168:1(a)(3).

334.    As a result of these false submissions, the state of Georgia paid money to the defendants.

335.    As a result of these false submissions, the state of Georgia, by and through its Medicaid program, has been damaged.

**COUNT XVI**
**DEFENDANTS' VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE**
**CLAIMS ACT, TITLE 63, SECTION 5053.1-B-1**

336.    The allegations of ¶¶ 1-335 are incorporated as if rewritten.

337.    Defendants have knowingly presented, or cause to be presented, to the State of Oklahoma, false and fraudulent claims for payment or approval in violation of the Oklahoma Medicaid False Claims Act, Title 63, Section 5053.1-B-1.

- 68 -

338.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes; false submissions for reimbursement for services which were substandard, worthless, or not provided within a medically acceptable standard of care; and false submissions for upcoded services.

339.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Oklahoma.

340.    Defendants also knowingly made or used, or caused to be made or used, false or fraudulent records or statements to get a false or fraudulent claim paid or approved by the state of Oklahoma in violation of the Oklahoma Medicaid False Claims Act, Title 63, Section 5053.1-B-2.

341.    Defendant Mobilex conspired with all of the other defendants to make or use, and to present, false claims to be paid or approved by the state of Oklahoma, by entering into overt agreements for the referral of federally-funded healthcare business in exchange for below-market discounts, in violation of the Oklahoma Medicaid False Claims Act, Title 63, Section 5053.1-B-3.

342.    As a result of these false submissions, the state of Oklahoma paid money to the defendants.

343.    As a result of these false submissions, the state of Oklahoma, by and through its Medicaid program, has been damaged.

**DAMAGES SOUGHT**

344.    As a result of the defendants' actions, individually and collectively, the United States;  the states of Illinois, Delaware, Indiana, New York, Rhode Island, Texas, New Mexico, New Hampshire, Michigan, Georgia, and Oklahoma; the Commonwealths of Massachusetts and Virginia;  and Kevin McDonough have been damaged.

WHEREFORE, Relator requests the following relief:

A.    Judgment against defendants for three times the amount of damages the United States and the named States and Commonwealths have sustained because of their actions, plus a civil penalty of $11,000 for each violation of the False Claims Act.

B.    25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not.

C.    All forms of relief afforded by 31 U.S.C. § 3730(h).

C.    His attorneys' fees, costs, and expenses.

D.    Such other relief as the Court deems just and appropriate.

Respectfully submitted,

_____/s/ Frederick M. Morgan, Jr._____
Frederick M. Morgan, Jr.
Jennifer M. Verkamp
MORGAN VERKAMP LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202
Telephone: (513) 651-4400
Facsimile:   (513) 651-4405
Email: rick.morgan@morganverkamp.com
         jennifer.verkamp@morganverkamp.com

- 70 -

REGINA D. POSERINA
7415 West Chester Pike
Upper Darby, PA 19082
Telephone:  (610) 352-0760
Facsimile:    (610) 352-5557
Email: rposerina@verizon.net