

FILED
JAMES BONINI
CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

2011 JUN -3 AM 11: 51

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*ex rel.* KEVIN P. McDONOUGH, | : | Civil Action No.2:08-CV-0114 |
| Bringing this action on behalf of<br>of THE UNITED STATES OF AMERICA,<br>THE STATES OF ILLINOIS, NEW YORK,<br>TEXAS, MICHIGAN, and GEORGIA,<br>AND THE COMMONWEALTHS OF<br>MASSACHUSETTS AND VIRGINIA | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Judge Marbley_____<br>Magistrate Judge Abel |
| Plaintiffs and Relator | :<br>: |  |
| v. | :<br>: |  |
| SYMPHONY DIAGNOSTIC SERVICES, INC.;<br>SYMPHONY DIAGNOSTIC SERVICES NO. 1,<br>d/b/a MOBILEX, U.S.A., | :<br>:<br>: |  |
| Defendants. | :<br>: |  |

**PROPOSED AMENDED COMPLAINT**
**FOR VIOLATIONS OF THE FALSE CLAIMS ACT**

I.  **INTRODUCTION**

1.  Qui Tam Relator Kevin P. McDonough brings this action on behalf of the United States for treble damages and civil penalties arising from Defendants' conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). The violations arise out of false claims for payment made to Medicare, Medicaid, TRICARE and other federally funded government healthcare programs (hereinafter, collectively referred to as "Government Healthcare Programs").

2.  This complaint details illegal conduct through which defendants caused the submission of false claims in violation of the False Claims Act.  These claims

involve illegal kickback schemes by Defendants to provide reduced rates for mobile x-ray services it provided to nursing homes for Medicare Part A patients in exchange for referrals of patients covered by Medicare Part B and other government healthcare programs business, commonly referred to as "swapping arrangements."

## II.  JURISDICTION AND VENUE

3.      Many of the acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein occurred within the Southern District of Ohio, and Defendants do business in the Southern District of Ohio.  Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. 3732(a), as well as under 28 U.S.C. § 1345.  The Court is asked to accept supplemental jurisdiction over those Counts which allege violations of state False Claims Acts.

4.      Venue lies under 31 U.S.C. § 3732(a).

5.      The facts and circumstances which give rise to Defendants' violations of the False Claims Act have not been publicly disclosed in a criminal, civil, or adminis-trative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

6.      Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

7.      Relator provided disclosure of the allegations of this complaint to the United States prior to filing.

III. **PARTIES**

A. **Relator**

8. The United States of America is the real party in interest to the claims advanced in Counts I and II.

9. Kevin McDonough, a Florida resident, is a x-ray technologist registered to practice in Florida, Ohio, Kentucky, Indiana, and West Virginia.  In 1983 he established his own business, Mobile X-Ray Specialists of Florida and in 1994, he established Mobile X-Ray Specialists of Georgia.  From 1983 through 1999, through these two businesses, he contracted to provide portable x-ray services to approximately 130 nursing homes.

10. During this time, Mr. McDonough was active in the National Association of Portable X-Ray Providers, serving as its vice president from September 1993 through April 30, 1998.  He served as the charter vice president of the Florida Alliance of Portable X-Ray Providers ("FAPXP") from 1996 until 1999.  He continues to remain active in both organizations.

11. Beginning in November 1996, nursing home clients began terminating their contracts with Mr. McDonough's mobile x-ray businesses.  One reason, among others, was that Mr. McDonough's competitors in the mobile x-ray business were providing services below market value rates, and below costs.

12. Mr. McDonough sold the Georgia company in 1997 and the Florida company in 2000.  From 2000 to 2005 he worked as a consultant to other mobile x-ray companies.

- 3 -

13.     In September 2005, Relator was hired by defendant Mobilex and worked out of Mobilex's Midwest Regional Office in Worthington, Ohio from approximately October 1, 2005 to September 11, 2006. He was hired for the stated purpose of assisting in the operations of the Midwest regional office and reopening Mobilex's Southeast office, based in Florida, which had previously closed.

14.     During his time in Ohio, besides his work in reopening the Florida office, Mr. McDonough traveled on occasion to Mobilex's Pennsylvania office. He was in regular contact with Mobilex CEO William Glynn, and personally reviewed information and documents related to the national practices of Mobilex.

15.     Since September 12, 2006, Mr. McDonough has worked as an independent mobile x-ray consultant.

16.     The facts alleged in this complaint are based upon Mr. McDonough's direct and independent knowledge obtained from his personal experiences operating his own businesses, serving as a consultant to other businesses, and working as an employee of defendant Mobilex.

17.     The practices which resulted in the submission of false claims Mr. McDonough witnessed were uniformly implemented throughout the MobilexUSA nationwide system.

**B.     Defendants**

18.     Defendant Symphony Diagnostic Services, Inc., a Delaware Corporation d/b/a Symphony Mobilex; Defendant Symphony Diagnostic Services No. 1, Inc., a California Corporation, d/b/a Symphony Mobilex; and Mobilex USA (among others) became wholly owned subsidiaries of Integrated Health Services Inc. in the mid 1990's.

- 4 -

19.    In or about February 2000, Integrated Health Services and many of its subsidiaries, including Symphony Diagnostic Services, Inc. filed separate voluntary petitions with the U.S. Bankruptcy Court in Delaware to reorganize under Chapter 11. The bankruptcy plan was effective date on October 10, 2003. On that date, IHS entered into a global settlement for False Claims Act violations. IHS's assets were sold by the bankruptcy court. Trans Health,Inc. (THI) took over some (not all) of its nursing homes, RehabCare took over its rehabilitation group, Rotech Healthcare, Inc. took over its respiratory company, and Symphony Mobil ex was purchased by former officers of Symphony, now d/b/a Mobilex USA.

20.    In 2002, Mobilex Acquisition Group, a Delaware limited liability company, purchased Symphony Diagnostic Services, Inc. from Integrated Health Services. Mobilex Acquisition Group is a subsidiary of ZAC Mobilex Holdings, also a Delaware limited liability company.

21.    Symphony Diagnostic Services, Inc. and its subsidiaries, including Symphony Diagnostic Services No. 1, Inc., now do business in 30 states, including Ohio, as Mobilex U.S.A., hereinafter called "Mobilex." From 2002 to present, William Glynn has been CEO of Mobilex.

22.    Mobilex has regional offices in Worthington, Ohio; Dallas, Texas; Clearwater, Florida; Brockton, Massachusetts; and Horsham, Pennsylvania.

23.    The policies and procedures in place in the Midwest regional office are the same policies and practices used nationwide. The frauds and schemes to submit false claims witnessed by Mr. McDonough in Ohio are in full force in all Mobilex locations.

- 5 -

IV.     **FACTUAL ALLEGATIONS**

24.     This case involves the submission for payment with federal and state funds of a large number of false claims for payment resulting from a swapping arrangement created by Mobilex and marketed to nursing homes.  Mobilex provides portable x-ray services to nursing homes at below-cost rates for patients with Medicare Part A coverage in exchange for referrals of patients who do not have Part A coverage.  Mobilex then bills the services provided to patients without Part A coverage at full cost directly to government healthcare programs.

A.     **Submission of Claims For Portable X-ray Services**

25.     The Medicare program, established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et. seq.,* consists of  two parts.  Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care, to include care in skilled nursing facilities (nursing homes) and long-term care facilities.  Medicare Part B authorizes the payment of federal funds for medical and other health services, including without limitation, physician services, laboratory services, outpatient therapy, diagnostic services and radiology services.

26.     Medicare Part B also pays for certain services furnished to facility inpatients who are either not entitled to benefits under Part A or who have exhausted their Part A benefits but are entitled to benefits under Part B of the program.

27.     Under the authority of the Social Security Act, the Secretary of HHS administers the Medicare Program through Centers for Medicare and Medicaid Services (CMS).  CMS contracts with private insurance companies to administer the

processing of claims. Part A reimbursement is processed through fiscal intermediaries. Part B reimbursement is processed through Medicare carriers.

28.     Medicare enters into provider agreements with providers and suppliers to establish the facilities' eligibility to participate in the Medicare Program. In order to be eligible for payment under the program, providers and suppliers must certify that they understand that payments of claims are conditioned on the claims and the underlying transactions complying with laws, regulations and program instructions (including the anti-kickback statute and the Stark laws) .

29.     The inpatient facilities at issue in this case are primarily skilled nursing facilities (nursing homes), commonly referred to as SNF's.

30.     The Balanced Budget Act of 1997 changed SNF reimbursement for patients covered under Medicare Part A to a prospective payment system ("PPS"), beginning with the first cost reporting period after July 1, 1998. Under PPS, skilled nursing facilities are paid a fixed *per diem* amount for each Medicare Part A patient, which covers the routine, ancillary, and capital-related costs associated with that patient's stay. The *per diem* amount depends on the severity of the patient's condition, classified according to resource utilization groups (RUGs). The current version of RUG classifications is RUG III.

31.     Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. In order to receive payment, an SNF must submit claims for its Part A patients to its fiscal intermediary on CMS Claim Form 1450 (also called a UB-92). At the end of its annual cost reporting period, the SNF must submit cost reports detailing the expenses and revenues for its

facility along with the patient activity.  This annual cost report is the final claim and is submitted on CMS Form 2540-96 (unless the facility qualifies for a simplified cost report on Form 2540s).

32.     Annual cost reports constitute the final accounting of the facility's federal program reimbursement: Medicare relies upon the Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. Moreover, as a condition of payment, the SNF must certify in its annual cost report that all data is accurately and truthfully reported and that it has complied with all applicable laws and regulations, including without limitation the Anti-kickback laws.

33.     CMS uses the data submitted on the cost reports to support management of the federal programs, including to develop the cost limits and rates applicable to providers and suppliers.

34.     Each SNF's Part A *per diem* includes the facility's costs for diagnostic radiology services performed for Part A inpatients.  Thus, for mobile x-ray services furnished for Part A inpatients, the SNF pays the supplier for the services, and then bills Medicare for the Part A rate.  The SNF is required to accurately report its actual payments to suppliers, including the mobile x-ray companies, on its annual cost reports.

35.     If the SNF inpatient is ineligible for Part A or has exhausted his or her benefits under Part A, the costs of radiology services are covered under Part B.

36.     In addition, diagnostic radiology services include both a technical and professional component.  The professional component--the radiologist's interpretation of the x-rays–is billed separately by the physician or the physician's assignees under

Part B.   The technical component—the service performed by the portable x-ray supplier—is billed, as described above, either (1) by the SNF if the service is part of the Part A claim or (2) by the portable X-ray supplier if the service is being provided for an SNF resident with no Part A coverage (and so is being reimbursed under Part B).

37.     Prior to the implementation of the PPS, ancillary services such as the portable x-ray services at issue here, could either be billed directly by the portable x-ray supplier or by the SNF under an arrangement with the supplier.  In the latter scenario, the supplier would bill the SNF and then the SNF would bill its fiscal intermediary.  Because of the reasonable cost reimbursement applicable to SNF's at that time, the supplier could bill the SNF at rates well above the Medicare fee schedule and the SNF could submit such costs as part of its annual cost report.

38.     Such billing for portable x-ray services was singled out in a trilogy of reports by the Department of Health and Human Services Office of Inspector General, as an area of Medicare abuse.  Portable Imaging Services: A Costly Option (OIG, November 1997), http://oig.hhs.gov/oei/reports/oei-09-95-00090.pdf; Portable Imaging Services: Nursing Home Perspectives (November, 1997); Imaging Services for Nursing Home Patients: Medical Necessity (OIG, August 1997).   The Inspector General concluded, *inter alia*, that only two percent of chest x-rays of nursing home patients were medically necessary; that portable imaging providers were overpaid by tens of millions annually as a result of these arrangements; and that nursing homes could not explain why they chose to bring in portable x-ray providers rather than transport their patients to hospitals or other locations for non-portable imaging services.

- 9 -

39.     Under PPS, however, these services provided to Part A patients are covered under the Part A *per diem* and are not billed separately.  Pursuant to the SNF Consolidated Billing requirements that were implemented as a part of the PPS system, the SNF is responsible for including on its submission almost all of the services that a resident receives during the course of its stay, even services billed under arrangement.  Medicare's payment to the SNF represents payment in full for arranged-for services and suppliers must look to the SNF (rather than Medicare Part B) for their payment.

40.     Part B services for patients who are not eligible under Part A or who have exhausted Part A benefits (referred to as Part B residents) are excluded both from SNF PPS and Consolidated Billing.  Services provided to Part B residents may be billed by the SNF or the supplier under an arrangement with the SNF.  In the present case, portable x-ray services for Part B residents were billed by the supplier to CMS via its Part B carriers.

41.     CMS sets the maximum allowable amounts for covered Part B services through the Medicare Fee Schedule ("MFS").  Portable X-ray services submitted under Part B are reimbursed under the Medicare Fee Schedule.

42.     There are three parts to the payments for portable x-rays services under the MFS.

> a.     Payment for the particular type of x-ray study performed, according to the proper CPT code;
>
> b.     Payment for each set-up component per procedure, a "Q" code, which averages approximately $15 per procedure, set according to locality under the Medicare Fee Schedule;
>
> c.     Payment for the cost associated with transporting the equipment to the place of service, an "R" code, also known as the mobile code.

Code R0070 indicates that one portable x-ray was performed during a mobile visit and R0075 indicates that multiple x-rays were performed, with modifiers to indicate the number of patients serviced. These rates are set by the carrier, and vary by state.

43. Nursing home providers serviced by Mobilex have paid and continue to pay Mobilex for services provided to patients with Part A coverage at a rate substantially below the MFS allowance. In some cases, Mobilex does not require SNF's to pay anything for Part A portable X-ray services.

44. Mobilex solicits and accepts reduced rates for portable x-ray services as *quid pro quo* for becoming the exclusive provider of portable x-ray services to all patients of the SNF, including the Part B residents.

**B.    Compliance with the Anti-Kickback law is a condition of payment under federally-funded healthcare programs**

45. The Anti-kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and ©; 42 U.S.C. § 1320a-7b,

- 11 -

Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare

and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

46.    The Anti-kickback Statute prohibits any person or entity from making or

accepting payment to induce or reward any person for referring, recommending or

arranging for federally-funded medical services, including services provided under the

Medicare, Medicaid and (as of January 1, 1997) TRICARE programs.  In pertinent part,

the statute states:

> (b) Illegal remuneration
>
> (1) whoever knowingly and willfully solicits or receives any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind --
>
>> (A) in return for referring an individual to a person for the
>> furnishing or arranging for the furnishing of any item or
>> service for which payment may be made in whole or in part
>> under a Federal health care program, or
>>
>> (B) in return for purchasing, leasing, ordering, or arranging
>> for or recommending purchasing, leasing, or ordering any
>> good, facility, service, or item for which payment may be
>> made in whole or in part under a Federal health care
>> program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not
> more than $25,000 or imprisoned for not more than five years, or both.
>
> (2) whoever knowingly and willfully offers or pays any remuneration
> (including any kickback, bribe, or rebate) directly or indirectly, overtly or
> covertly, in cash or in kind to any person to induce such person --
>
>> (A) to refer an individual to a person for the furnishing or
>> arranging for the furnishing of any item or service for which
>> payment may be made in whole or in part under a Federal
>> health care program, or
>>
>> (B) to purchase, lease, order or arrange for or recommend
>> purchasing, leasing or ordering any good, facility, service, or

> item for which payment may be made in whole or in part
> under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be
> fined not more than $25,000 or imprisoned for not more than five
> years, or both.

42 U.S.C. § 1320a-7b(b). Violation of the statute can also subject the perpetrator to

exclusion from participation in federal health care programs and, effective August 6,

1997, civil monetary penalties of $50,000 per violation and three times the amount of

remuneration paid. 42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

47.    Regulations implementing the Anti-Kickback Act have created certain safe

harbors protecting payments that meet narrow conditions. For example, there is a

regulatory safe harbor that may apply to certain discounts to providers who submit cost

reports as long as they are given at the time of sale in an arms-length transaction; are

fully disclosed by the provider to the United States in the cost report; and are fully and

accurately reported by the seller to the provider in a written statement that advises of

the provider's obligation to disclose to the United States.  Notwithstanding that Relator

alleges that such requirements were not met here, this safe harbor specifically does not

apply to:

> Supplying one good or service without charge or at a reduced charge to
> induce the purchase of a different good or service, unless the goods and
> services are reimbursed by the same Federal health care program using
> the same methodology and the reduced charge is fully disclosed to the
> Federal health care program and accurately reflected where appropriate,
> and as appropriate, to the reimbursement methodology.

42. U.S.C. § 1001.952(h)(5).

48.    Payment of remuneration of any kind violates the statute if one or any

purpose for that remuneration was to induce referrals.  Moreover, payments to

- 13 -

physicians in return for the physicians' promises to send patients to a particular facility qualify as kickbacks. Giving a person the opportunity to earn money may also constitute an inducement under the Anti-kickback statute.

49.    In Advisory Opinion No. 99-2 (February 26, 1999), the Department of Health and Human Services Inspector General considered the legality of an "arrangement [in which] Ambulance Company X will charge the Nursing Home fixed per-transport rates for … services covered by Medicare Part A…. [which] represent discounts of up to 50% of the 'reasonable charge' established by Medicare … Ambulance Company X will charge Medicare its full usual and customary amount for transporting Nursing Home residents for whom ambulance services are covered under Medicare Part B." The Inspector General described the arrangement as "swapping" because the parties were "swapping" the "discounts on their… Part A business in exchange for profitable non-discounted Part B business." The Inspector General concluded that the "Arrangement does not fit in the safe harbor and may involve illegal remuneration for the … referrals of ambulance business not covered by the PPS payment and not subject to the discount."

50.    The Inspector General also noted "reports…that suppliers of a wide range of [nursing home] services are giving [nursing homes] discounts for PPS-covered business that are linked, directly or indirectly, to referrals of Part B business," and stated:

> In evaluating whether an improper nexus exists between a discount and referrals of Federal business in a particular arrangement, we look for indicia that the discount is not commercially reasonable in the absence of other, non-discounted business. In this regard, discounts on SNF PPS business that are particularly suspect include, but are not limited to:

- 14 -

a.   Discounted prices that are below the supplier's cost;

b.   Discounts on PPS-covered business that are coupled with exclusive supplier agreements, and

c.   Discounts on Medicare PPS or other capitated or prospective payment business made in conjunction with explicit or implicit agreements to refer other facility business to the supplier, including Part B or other Federal health care program business.

51.    In a publication titled *Compliance Program Guidance for Nursing Homes*, the Inspector General stated that a kickback violation would likely occur where "suppliers...offer a SNF an excessively low price for items or services reimbursed under PPS in return for the ability to service and bill nursing home residents with Part B coverage." 65 Fed. Reg. 14289, 14298 n. 75.

52.    In Advisory Opinion 10-26 (December 28, 2010), the OIG found a potential illegal kickback, in violation of the Antikickback Statute, where an ambulance company provided below cost services to SNF patients, with the potential of referral of other Government funded work.   The particular plan involved Medicaid patients, some of whom were dually eligible under Medicare.  The ambulance company sought to offer SNFs a per diem rate for transports, based on Medicaid resident days regardless of the number of actual transports, while waiving copayment and deductible requirements for dual eligibles.  The ambulance company also suggested a flat fee for service proposal that would be below cost.  Noting its repeated position that "[a]ny link or connection, whether explicit or implicit, between the price offered for business paid out of the purchaser's pocket and referrals of federal program business... will implicate the anti-kickback statute," the OIG concluded that this proposed arrangement could violate the Antikickback Statute.

- 15 -

53.     In Advisory Opinion 02-7 (June 12, 2002), the OIG concluded that the waiver of the Medicaid co-pay for dual eligible beneficiaries (that is, those eligible for Medicare and Medicaid), may amount to an illegal kickback under the Antikickback Statute.  A portable x-ray provider was willing to forego a beneficiary's Medicaid co-pay, by providing a waiver to SNF dual eligible residents.  This waiver request would result in the portable x-ray provider not collecting approximately twenty percent of the service cost.  OIG found this waiver unacceptable, as it would not be offered uniformly to all patients and payers; would benefit SNFs, who are referral sources for the portable x-ray providers; and would give the requestor a competitive advantage over other portable x-ray providers.  Therefore, OIG concluded, such a waiver could generate remuneration and an illegal kickback.

54.     Every provider and supplier, is required to sign a provider agreement certifying that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [this provider/supplier/physician]. The Medicare laws, regulations, and program instructions are available through the [Medicare contractor].  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

55.     The discounts provided by Mobilex to the nursing homes constitute "remuneration" as that term is used in the Anti-Kickback Act.  These discounted rates are below fair market value and confer a benefit on the provider defendants that is intended to account for the volume or value of federally-funded business referred to Mobilex.

- 16 -

56.     Specifically, Mobilex offers and pays such remuneration in exchange for referrals for Part B portable imaging services.  This scheme is known as "swapping," because Mobilex swaps cut-rate or free Part A portable imaging services for lucrative exclusivity for Part B patients.

57.     This swapping scheme violates the provisions of the Anti-Kickback Act. By engaging in this scheme, Mobilex knowingly submits false claims for Part B services obtained pursuant to illegal incentives offered providers through free or deeply discounted Part A services.

58.     Mobilex's scheme does not qualify for safe harbor protection under the Anti-kickback statute. Indeed, a purpose of payment is to induce the referral of business paid under federal health care programs.

## C.     Mobilex's Disregard of Corporate Integrity Agreement

59.     Symphony Diagnostic Services, Inc., d/b/a Mobilex, has previously entered into a Corporate Integrity Agreement (CIA) with HHS-OIG as part of a settlement agreement with the United States of previous allegations against the company related to false claims to federally-funded healthcare programs.  *See* CIA, http://oig.hhs.gov/fraud/cia/agreements/Symphony%20Diagnostic%20Services,%20Inc %2009%2009%202003.pdf.

60.     Compliance with that agreement is a condition of its continued participation in federal health care programs.

61.     Among other things, that CIA required Symphony to establish a Compliance Program that would ensure that it complied with all applicable statutes, regulations, policies, and the CIA.

- 17 -

62.    The CIA also required a program of internal audit to make findings of whether future claims and submissions to federal healthcare programs are accurate and in compliance with applicable law.

63.    The CIA requires a detailed claims review and an annual report to the OIG with its findings.

64.    Mobilex's continued illegal schemes to submit and cause the submission of false claims to the United States, as alleged herein, is not compliant with its CIA with the United States.

D.    **Mobilex's Relationship With Nursing Home Providers:
Illegal Swapping Scheme**

65.    Mobilex is the largest single portable x-ray provider in the country, ac-counting for more than fifty percent (50%) of all portable x-rays billed under both Medicare Parts A and B.  Mobilex has contracts with national nursing home chains and with local, smaller nursing homes.

66.    Prior to the introduction of PPS, Mobilex's contracts with nursing homes provided for a fee-for-service arrangement in which Mobilex's bills were passed through by the nursing homes to the fiscal intermediaries (and thus to Medicare).  This resulted in excessively large profits for Mobilex.

67.    The introduction of PPS devastated Mobilex's business model.  As a result, Mobilex adopted a new system of marketing and selling its services to patient-care facilities.  Under this model, which remains in place throughout Mobilex's system, Mobilex contracts with patient care facilities to provide, with respect to the facility's Medicare Part A patients, either a per-diem rate for all x-ray services provided or a flat

fee per service. In either case, Mobilex provides services to Part A patients at charges to the facility which are substantially below market value, below MFS, and below Mobilex's cost of providing the services.

68.    In exchange for obtaining x-ray services for Part A patients at a cost to the facilities substantially below that contemplated by the PPS system, the facilities refer all other patients to defendant Mobilex for mobile x-ray services, many or most of whom are covered by Medicare Part B and Medicaid for whom Mobilex can bill third-party providers, including the Medicare and Medicaid programs, directly.

69.    In 2001, Mobilex's actual cost to perform a portable x-ray averaged approximately $96.62. For Medicare Part A patients, Mobilex's *per diem* rate ranged from $0.45 to $1.00 per patient day and the flat fees ranged from $50.00 to $75.00 per exam.

70.    By 2006, the Medicare Fee Schedule in Ohio, for example, allowed $145.25 for a single-view chest x-ray, including set-up fee, transportation fee, and technical cost. By 2009, the Medicare Fee Schedule in Ohio, allowed $162.40 for a single view chest x-ray, including set-up fee, transportation fee, and technical cost.

71.    In addition to the steep discounting of rates related to Part A patients, Mobilex regularly chooses not to collect its accounts receivable from the nursing homes, effectively providing its services for free. Mr. McDonough was informed that the outstanding debts to Mobilex were in the hundreds of thousands of dollars per region. Mobilex employees acknowledged to McDonough that the company had no intention of collecting its outstanding receivables.

72.     Payments for portable x-ray procedures under Medicare Part B coverage are huge.  In 2003, Medicare paid $103,101,106 under the R0070 code for 942,117 visits and $19,512,567 under the R0075 code for 420,218 multiple service visits.

73.     In 2004, under Part B, Medicare paid $114,832,268 under the R0070 code for 968,365 visits and $22,967,953 under the R0075 code for 443,502 multiple service visits.

74.     In 2006, under Part B, Medicare paid $123,301,065 under the R0070 code for 1,003, 629 visits and $23,824,740 under the R0075 code for 455,776 visits.

75.     Part B payments for the setting-up (Code Q0092) of portable x-ray procedures are also huge.  In 2003, Medicare paid $19,455,608 under the Q0092 code. In 2004, Medicare paid $20,470,129 under the Q0092 code.  In 2005, Medicare paid $23,824,740 under the Q0092 code.

76.     Approximately twenty percent of nursing home patients are covered by Medicare Part A.  Mobilex CEO Glynn told Mr. McDonough that in 2006, Mobilex averaged 1.5 portable x-rays per Part A patient stay at a patient care facility under contract with Mobilex.

77.     In exchange for the reduced rates for Part A work, the nursing homes serviced by Mobilex refer all of their non-Part A work to Mobilex.  For all the non-Part A work, Mobilex billed the full Medicare allowable rate directly to the federal and state health care programs.

78.     Mobilex uses three pricing structures in its contracts with nursing homes: A flat rate per; a percentage discount off the MFS;  or a per diem rate tied to patient

census in a Part A stay per month.  Examples of the per diem rates include the following:

| Parent Co. | Regional facility | Accounting Date | Fee |
|---|---|---|---|
| Manor Care | Westerville | Dec. 2002 | $0.60 *per diem* |
| Extendicare | Arbors West | Dec. 2002 | $0.73 *per diem* |
| Kindred | LakeMed | Dec. 2002 | $0.60 *per diem* |
| Kindred | Logan | Dec. 2002 | $.95 *per diem* |
| LCCA | Elryia | Dec. 2002 | $1.40 *per diem* |
| LCCA | Wayne, IN | Dec. 2002 | $0.79 *per diem* |
| Covenant Care | Villa Springfield | Dec. 2002 | $0.60 *per diem* |
| Sun | Harborside Troy | Dec. 2002 | $ 0.45 *per diem* |
| Sun | SunBridge, New Lexington | Dec. 2002 | $0.65 *per diem* |
| Harborside Healthcare | Broadview Hgts | Sept. 2005 | $0.54 *per diem* |
| Communicare | Columbus | Dec. 2005 | $0.75 *per diem* |

79.    All SNFs that are offered a discount off the MFS are offered up to a twenty five percent discount, plus at least another eight percent "prompt pay discount," for a total discount of thirty three percent (33%).  The prompt pay discount was offered regardless of whether payment was made promptly or not, and therefore is not a legitimate discount for early payment.

80.    Since at least 2002, Mobilex's contracts for the performance of portable x-rays have not reflected a discount.  Instead, these discounts are recorded on a separate document called the Facility Data Sheet ("FDS").  The FDS shows the name of the SNF, the services to be provided, and the percentage of the Part A discount.

81.    The FDS contains a box for checking off "discount," and then a space after that box where the negotiated discount is written.

82.     Robin Reichert, the national vice president of Mobilex for sales and marketing since at least 2004, is responsible for negotiating the discounts offered to national chain SNFs.  Ms. Reichert is also responsible for signing off on the discount rate for every SNF that contracts with Mobilex.

83.     Ms. Reichert signs most or all contracts between Mobilex and its customers.  All signed contracts are kept at the corporate headquarters, but the FDS documents are kept at the regional offices of Mobilex where the particular SNF is serviced.

84.     When offering discounts, Mobilex states to its SNF clients that it cannot offer discounts that are greater than Mobilex's costs.  However, the actual cost figures used by Mobilex in calculating the discounts are Mobilex's <u>direct</u> costs.  Mobilex's indirect costs, including all corporate employees, call center employees and billing center employees, are not included in Mobilex's cost figures.  Therefore, any Part A service offered at "cost" is still a discount because it fails to take into consideration all of Mobilex's costs.

85.     This manner of calculating discounts greater than costs has been used by Mobilex, upon information and belief, from 2004 to the present.

86.     Mobilex CEO Glynn was aware of the fraud schemes alleged herein, having been notified by Mr. McDonough or by personally acknowledging the existence of the fraud scheme on numerous occasions, including during the following events:

        a.      November 2005 Atlantic region sales meeting;

        b.      January 19, 2006 conference call in which Glynn reminded employees to keep patient numbers up because per diem payments were directly related to the number of Part A patient days per facility;

- 22 -

    c.     March 8, 2006 meeting with Relator McDonough in a Columbus, Ohio, Radisson hotel, during which Glynn stated that "you can't negotiate with clients you don't have....Sooner or later, we will try to negotiate with them to rates that are compliant [with Medicare rules and regulations]."

27.    Relator discussed with CEO Glynn, or heard Mr. Glynn discuss, the swapping scheme at issue on at least the following occasions:

    a.     The Mobilex Atlantic Region sales meeting in November, 2005.

    b.     On January 19, 2006, during a conference call, Glynn reminded employees to keep patient numbers up (since per diem payments were directly related to the number of Part A patient days per facility).

    c.     At a March 8, 2006 meeting with Mr. McDonough in a Columbus, Ohio, Radisson hotel, Glynn said, quoting or closely paraphrasing, that "you can't negotiate with clients you don't have. Sooner or later, we will try to negotiate with them to rates that are compliant" with Medicare rules and regulations.

    d.     When asked by Mr. McDonough, at this same meeting on March 8, 2006, to stop offering discounted PPS Part A rates, or to fight the nationwide abuse of the PPS system by exposing the fraud, Glynn stated that he did not want to do so, and that his partners would not permit it. Mr. Glynn instructed Mr. McDonough to take no such actions.

87.    In December 2005, when asked why Mobilex was willing to engage in swapping, Glynn said that it is "better to ask forgiveness [of the Federal government] than permission." Also in December 2005, Mobilex's Eastern regional vice president, Dave Williams, gave the same response, saying, "Bill Glynn says, 'It is better to ask for forgiveness than permission.'"

88.    In 2006, Mobilex began providing services to the Sava Senior chain of SNFs, headquartered in Atlanta, GA. The rate offered to some Sava facilities was a per-bed rate of between ten cents and one dollar *per diem*, a below-cost rate. Ms.

Reichert stated that Mobilex "will have to leave this rate where it is, but increase it very slowly, or else they [Sava] will leave [Mobilex]."

89.     When representatives of SNFs that are part of large chain organizations contract with Mobilex, they are told by Ms. Reichert that Mobilex will only offer large discounts if all of the chain's facilities contract with Mobilex. Ms. Reichert has used this inducement, upon information and belief, from 2004 to present, to entice SNFs to contract exclusively with Mobilex. Large chain SNFs that have been offered such discounts include HCR Manor Care; Beverly Enterprises d/b/a Golden Living Centers, Inc.; Sun Healthcare Group; Extendicare Healthcare Services; Kindred Healthcare; Life Care Centers of America; National Healthcare Corporation; and Covenant Care.

90.     Small SNFs are also offered discounts if they have large numbers of patients with non-Part A Medicare. Large numbers of non-Part A Medicare patients, which are billed at full MFS rates, help Mobilex make up for the lack of collection of Part A payments.

91.     Approximately 20% of Mobilex's business involves performing x-ray services for Part A patients. Under the Medicare and Medicaid regulations, portable x-ray providers are required to seek payment from the SNFs where the services to Part A patients are provided and do not directly bill Medicare or Medicaid.

92.     Despite Part A services comprising a large part of Mobilex's business, they have routinely had only one employee responsible for collecting for these services–in 2005, Michelle Massey, senior supervisor of the Mobilex Facility Collection Team in Sparks. On or about October 19, 2005, Ms Massey showed Relator the many outstanding unpaid invoices from SNFs for Mobilex's services to their Part A patients.

- 24 -

93.     Debbie Begg, Mobilex MidWest Region Marketing manager, advised Mr. McDonough that Mobilex had not even tried to collect the discounted Part A bills from many nursing facilities.  For example, Ms. Begg stated in June 2006 that Saber Management owed Mobilex $250,000 for Part A Medicare patients.

94.     If bills to SNFs for Part A patients were more than 150 days past due, Mobilex employees were instructed to ask the SNFs for payment, but requests were frequently ignored and generally not followed up on.  This practice was ongoing during Relator's employment there from 2005 to 2008, and upon information and belief, began in at least 2004 and has continued till the present.

95.     SNFs in the Southeast, including in Florida, told Mobilex's competitor portable x-ray companies that Mobilex had no expectation of being paid for the performance of x-rays to Part A Medicare patients.

96.     On information and belief, Mobilex never turned any SNF over to a collection agency due to failure to pay its outstanding Part A bills.

97.     On information and belief, Mobilex never stopped performing services to Part A SNF patients, even when the SNF did not pay its outstanding Part A bills.

98.     In light of the foregoing practices, it is believed that Mobilex wrote off as uncollectible all unpaid invoices from SNFs no later than one year after the services were billed, if ever.

99.     As more evidence that Mobilex did not expect to be paid for Part A portable x-ray services, Mobilex did not even attempt to keep accurate records for Part A patients it x-rayed, failing to record patient names, Medicare numbers, addresses,

DOS, and CPT codes.  This lack of accurate record keeping occurred, from a minimum, between 2004 and 2007 and upon information and belief, continues to the present.

100.    As part of the billing for portable x-rays, the professional component, ("PC"), referencing the radiologist's reading of the x-ray, is billed by the radiologist directly to Medicare as Part B services. In order for the radiologist to bill Medicare for the PC, the radiologist, of course, needs the patient name, Medicare number, etc.

101.    Since Mobilex often did not gather the necessary information, the radiologists were not able to bill for many of their services.

102.    Apex Radiology, a teleradiology practice in Florida, performed readings for Mobilex from 2002 to 2007.  Apex was able to bill the PC portion of the exams for only about twenty to thirty percent of the readings it performed for Mobilex.

103.    A Mobilex employee, upon information and belief Ms. Massey, in 2005, 2006, and 2007, told an Apex employee that Mobilex did not have the names, addresses, Medicare numbers, dates of service, or CPT codes for the x-ray services they provided.

104.    The Mobilex employee also reported that Mobilex spends very little time billing the SNFs for Part A services because Mobilex does not get paid for the performance of these services.

105.    Upon information and belief, every SNF Part A patient who received a portable x-ray performed by Mobilex received a service related to an illegal swapping arrangement.

106.    Exhibit 1 identifies, with coded patient names, a small subset of the SNFs with which Mobilex contracted to provide both Part B and Part A x-ray services.  Apex

was hired to provide interpretation, and is the source of these data. The billing information for these x-rays was obtained independently by Apex as it attempted to bill Medicare for the professional component of the Part A services. Mobilex routinely failed to provide Apex with Part A billing data and, on information and belief, did not collect it–because it was providing the Part A services only as a swap to obtain the exclusive right to provide Part B services to the facility's patients.

107. Mobilex offered commercially-unreasonable discounts to these and many other facilities to provide Part A services in trade for the exclusive right to provide Part B services. These arrangements violate the AKS, and all claims resulting from these illegal arrangements violate the False Claims Act.

## COUNT I
### DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT
### UNDER 31 U.S.C. § 3729 (a)(1) and (a)(2)

108. Relator realleges ¶¶ 1-107 as though fully set out herein.

109. Defendant Mobilex, by and through its officers, directors, parents and subsidiaries, and other affiliated companies, knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients unlawfully referred to Mobilex by nursing homes to whom Mobilex provided kickbacks and/or illegal remuneration in violation of the Anti-kickback laws.

110. Each of defendants' actions were with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information submitted to the United States.

- 27 -

111.    Defendants also knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government.

112.    Defendants knowingly created false records or statements that have concealed or failed to disclose the occurrence of events that materially affect their continued rights to receive Medicare and Medicaid funds, including their participation in kickback schemes.

113.    By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

**COUNT II**
**DEFENDANT MOBILEX'S RETALIATION AGAINST**
**RELATOR IN VIOLATION OF 31 U.S.C. §3730(h)**

114.    Relator realleges ¶¶ 1-113 as though fully set out herein.

115.    Kevin McDonough was hired by defendant Mobilex on or about October 1, 2006.

116.    Mr. McDonough's job at defendant Mobilex was multi-faceted, working with no job description, at the direction of Mobilex CEO Glynn.  Mr. McDonough was directed to assist the MidWest office of defendant Mobilex; to assist the opening of the SouthEast office of defendant Mobilex; and to provide assistance to Mobilex CEO Glynn as requested.

117.    As a result of this job, Mr. McDonough was in contact with Mr. Glynn on a regular basis.

- 28 -

118. As alleged above, Mr. McDonough alerted Mr. Glynn and other officers and managers to the illegal practices identified in this complaint.

119. Mr. Glynn and other Mobilex managers acknowledged the practices, but refused to stop them.

120. As a result of his objections to these practices, Mr. McDonough was fired.

121. Mr. McDonough was terminated in retaliation for the lawful acts of Mr. McDonough in furtherance of an action under the False Claims Act.

122. Mr. McDonough has been unable to obtain employment in the field of mobile x-ray technology since being fired by Mobilex.

123. As a result of defendant Mobilex's actions, Mr. McDonough was harmed.

## COUNT III
## DEFENDANTS' VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 ILCS 175 §3 (a)

124. Plaintiffs incorporate paragraphs 1 through 123 as though set out at length herein.

125. Defendants have knowingly presented, or cause to be presented, to the State of Illinois, false and fraudulent claims for payment or approval in violation of 740 ILCS 175 §3 (a)(1) .

126. Such submissions, as alleged above, include false submissions related to illegal kickback schemes.

127. Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Illinois.

- 29 -

128.    Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records to get false or fraudulent claims paid or approved by the State of Illinois in violation of 740 ILCS 175 §3 (a)(2) .

129.    As a result of these false submissions, the state of Illinois paid money to the defendants.

130.    As a result of these false submissions, the state of Illinois, by and through its Medicaid program, has been damaged.

## COUNT IV
## DEFENDANTS' VIOLATIONS OF THE MASSACHUSETTS FALSE CLAIMS LAW
## PART I, TITLE II, CHAPTER 13, §5 B

131.    Plaintiffs incorporate paragraphs 1 through 130 as though set out at length herein.

132.    Defendants have knowingly presented, or cause to be presented, to the State of Massachusetts, false and fraudulent claims for payment or approval in violation of Part I, Title II, Chapter 13, §5 B(1) .

133.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes.

134.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Massachusetts.

135.    Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records  to get false or fraudulent claims paid or approved by the State of Massachusetts in violation of Part I, Title II, Chapter 13, §5 B(2) .

136.   As a result of these false submissions, the state of Massachusetts paid money to the defendants.

137.   As a result of these false submissions, the state of Massachusetts, by and through its Medicaid program, has been damaged.

## COUNT V
## DEFENDANTS' VIOLATIONS OF
## VIRGINIA FRAUD AGAINST TAXPAYERS ACT
## VA. CODE ANN. §801.216.3 (a)

138.   Plaintiffs incorporate paragraphs 1 through 137 though set out at length herein.

139.   Defendants have knowingly presented, or cause to be presented, to the State of Virginia, false and fraudulent claims for payment or approval in violation of Va. Code Ann. §801.216.3(a)(1) .

140.   Such submissions, as alleged above, include false submissions related to illegal kickback schemes.

141.   Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Virginia.

142.   Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records  to get false or fraudulent claims paid or approved by the State of Virginia in violation of Va. Code Ann. §801.216.3(a)(2) .

143.    As a result of these false submissions, the state of Virginia paid money to the defendants.

144.    As a result of these false submissions, the state of Virginia, by and through its Medicaid program, has been damaged.

**COUNT VI**
**DEFENDANTS' VIOLATIONS OF THE NEW YORK  FALSE CLAIMS ACT**
**NY FINANCE LAWS, §189 (1)**

145.    Plaintiffs incorporate paragraphs 1 through 144 though set out at length herein.

146.    Defendants have knowingly presented, or cause to be presented, to the State of New York, false and fraudulent claims for payment or approval in violation of NY Finance Laws, §189(1)(a) .

147.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes.

148.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of New York.

149.    Defendants also knowingly made, used, or caused to be made or used, false or fraudulent records  to get false or fraudulent claims paid or approved by the State of New York in violation of NY Finance Laws, §189(1)(b).

150.    As a result of these false submissions, the state of New York paid money to the defendants.

151.    As a result of these false submissions, the state of New York, by and through its Medicaid program, has been damaged.

**COUNT VII**

**DEFENDANTS' VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW, TEX. HUM. RES. CODE §36.002**

152.    Plaintiffs incorporate paragraphs 1 through 151 set out at length herein.

153.    Defendants have knowingly presented, or cause to be presented, to the State of Texas, false and fraudulent claims for payment or approval in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(1).

154.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes.

155.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Texas.

156.    Defendants also knowingly or intentionally concealed or failed to disclose to the Texas Medicaid program,  the existence of kickbacks, remuneration in exchange for referrals, in its application for reimbursement from the Texas Medicaid program in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(2)(A).

157.    Defendants also knowingly or intentionally concealed or failed to disclose an event, to permit the defendants to receive a benefit or payment that is not authorized or that is greater than the payment or benefits that were authorized in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(2)(B). For example, Defendants failed to disclose the existence of kickbacks, that permitted these defendants to receive a benefit, participation, and a payment, reimbursement, that is not authorized or that is greater than the payments or benefits that were authorized,

- 33 -

such as exclusion. Defendant Mobilex also failed to disclose the existence of upcoding, and substandard care, that permitted defendant Mobilex to receive a benefit and payment, that is greater than the payments or benefits that were authorized.

158. Defendants knowingly or intentionally made, caused to be made, induced or sought to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Texas Medicaid program in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(4)(B).

159. Defendants knowingly or intentionally charge, solicit, accept, and/or receive, in addition to the amount paid under the Medicaid program, a gift, money, donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient, the cost of which is paid for, in whole or in part, under the Medicaid program. Defendants have no authorization for their acts under the Medicaid program and are acting in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(5).

160. Defendant Mobilex knowingly or intentionally entered into an agreement with all other defendants to defraud the State of Texas by obtaining or aiding another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent in violation of the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §36.002(8) when it devised illegal kickback schemes to generate referrals of additional Medicaid business.

161. As a result of these false submissions, the state of Texas paid money to the defendants.

162.    As a result of these false submissions, the state of Texas, by and through its Medicaid program, has been damaged.

## COUNT VIII
## DEFENDANTS' VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIM ACT
### MICH. COMPILED LAWS, SECTIONS 400.603, .604, .606, and .607

163.    Plaintiffs incorporate paragraphs 1 through 162 though set out at length herein.

164.    Defendants have made, presented, or caused to be made or presented, to the state of Michigan, claims to the Medicaid program, knowing the claim to be false in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.607.

165.    Such submissions, as alleged above, include false submissions related to illegal kickback schemes.

166.    Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Michigan.

167.    Upon information and belief, Defendants knowingly made, or cause to be made, a false statement or false representation of material fact in their application for Medicaid benefits in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.603(1), by falsely certifying that it would comply with applicable laws and regulations.

168.    Defendants also knowingly made, or cause to be made, a false statement or false representation of material fact for use in determining their rights to a Medicaid

benefit in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.603(2).

169.    As a result of their ongoing participation in kickback and/or overbilling schemes, Defendants have knowledge of the occurrence of an event affecting their initial or continued rights to receive a Medicaid benefit, and have concealed, or failed to disclose, that event with the intent to obtain a benefit to which the defendants are not entitled in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.603(3).

170.    Moreover, Defendants continue to present or cause to present claims to the State of Michigan notwithstanding that they have solicited, offered, and/or received a kickback in connection with the furnishing of services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program in violation of the Michigan Medicaid False Claims Act, Mich. Compiled Laws, Section 400.604.

171.    As a result of these false submissions, the state of Michigan paid money to the defendants.

172.    As a result of these false submissions, the state of Michigan, by and through its Medicaid program, has been damaged.

**COUNT IX**
**DEFENDANTS' VIOLATIONS OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT, OFFICIAL CODE OF GEORGIA, ANN., 49-4-168:1(a)**

173.    Plaintiffs incorporate paragraphs 1 through 172 though set out at length herein.

- 36 -

174. Defendants have knowingly presented, or cause to be presented, to the State of Georgia, false and fraudulent claims for payment or approval in violation of the Georgia State False Medicaid Claims Act, Official Code of Georgia, Ann. 49-4-168:1(a)(1).

175. Such submissions, as alleged above, include false submissions related to illegal kickback schemes.

176. Such submissions concealed or failed to disclose the occurrence of events that materially affect the defendants' continued rights to receive funds from the State of Georgia.

177. Defendants also knowingly made or used, or caused to be made or used, false or fraudulent records or statements to get a false or fraudulent claim paid or approved by the state of Georgia in violation of the Georgia State False Medicaid Claims Act, Official Code of Georgia, Ann. 49-4-168:1(a)(2).

178. As a result of these false submissions, the state of Georgia paid money to the defendants.

179. As a result of these false submissions, the state of Georgia, by and through its Medicaid program, has been damaged.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator, on behalf of himself and the United States, demands judgment against Defendants, as follows:

**AS TO COUNT I:**

180.    That the Court enter judgment against the Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of $11,000.00 for each false claim;

181.    That Relator be awarded all costs and fees incurred in this matter;

182.    That Relator be awarded thirty percent (30%) of all proceeds; and

183.    That the United States and Relator receive such further relief as the Court finds appropriate.

**AS TO COUNTS III THROUGH IX:**

184.    That the Court enter judgment against the Defendant for the maximum amount of damages and civil penalties available under each state, commonwealth, or district False Claims Act, to include the maximum multipliers provided in such Acts;

185.    That Relator be awarded all costs and fees incurred in this matter;

186.    That Relator be awarded thirty percent (30%) of all proceeds; and

187.    That each sovereign and Relator receive such further relief as the Court finds appropriate.  .

**AS TO COUNT II:**

188.    That Mr. McDonough receive all damages and other relief provided by 31 U.S.C. § 3730(h), including without limitation twice his lost pay both before and after trial, compensatory damages, and fees and costs.

Respectfully submitted,


_____/s/_____
Frederick M. Morgan, Jr. (0027687)
Trial Attorney for Relator

Jennifer M. Verkamp
Morgan Verkamp LLC
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202
Telephone: (513) 651-4400
Facsimile: (513) 651-4405
E-mail: rick.morgan@morganverkamp.com
jennifer.verkamp@morganverkamp.com

Regina D. Poserina (*pro hac vice* pending)
7415 West Chester Pike
Upper Darby, PA 19082
Telephone: (610) 352-0760
Facsimile: (610) 352-5557
E-mail: rposerina@verizon.net