**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| *ex rel.* **KEVIN P. McDONOUGH** | : | |
| | : | |
| | : | |
| **Plaintiff-Relator,** | : | **Case No. 2:08-CV-00114** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **SYMPHONY DIAGNOSTIC SERVICES,** | : | |
| **INC. and SYMPHONY DIAGNOSTIC** | : | |
| **SERVICES NO.1, d/b/a MOBILEX, U.S.A.** | : | **Magistrate Judge Mark Abel** |
| | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**OPINION AND ORDER**

## I.  INTRODUCTION

This matter is before the Court on the Motion to Dismiss Relator's Amended Complaint for failure to state a claim upon which relief can be granted and failure to plead fraud with particularity pursuant to Federal Rules of Civil Procedure 12(b)(6), 8(a), and 9(b), brought by Defendant Symphony Diagnostic Services, Inc., and Symphony Diagnostic Services No. 1, d/b/a Mobilex U.S.A. (collectively "Mobilex" or "Defendants").  (Dkt. 40).  For the reasons set forth herein, the Defendant's Motion is **GRANTED**, in part, and **DENIED**, in part.

## II.  BACKGROUND

### A.  Factual Background

This is a *qui tam* action brought by Plaintiff-Relator Kevin McDonough ("Plaintiff" or "Relator") pursuant to the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3279 *et seq.* and similar state law provisions.  In his Amended Complaint, Plaintiff sets forth allegations of a nationwide, and company-wide, Medicare fraud scheme being carried out by Defendant

Mobilex. The alleged scheme involves "swapping arrangements," where Mobilex offers substantial discounts to nursing homes for its x-ray services covered by the nursing homes' per diem, per-patient Medicare Part A reimbursements in exchange for patient referrals of the nursing homes' other Medicare and Medicaid service needs, for which Mobilex can bill publicly-funded insurance programs directly. Plaintiff alleges that this practice constitutes the payment of illegal kickbacks under the federal Anti-Kickback statute, *see* 42 U.S.C. § 1320a-7b, and the claims for reimbursement submitted by Mobilex to federal Medicare or Medicaid programs pursuant to such swapping arrangements constitute false claims under the FCA.

Mobilex specializes in providing portable x-ray services to in-patient facilities across the United States.[1] A large part of Mobilex's business is contracts with skilled nursing home facilities ("SNFs") to provide services to patients covered by Medicare Part A, Medicare Part B or both. Plaintiff, who has many years experience in the mobile x-ray industry and expertise in portable x-ray services, was hired by Mobilex CEO William Glynn in October 2005 to assist the operations of Mobilex's Midwest Regional Office based in Worthington, Ohio. His position was multi-faceted, and he had no specific job description other than assisting Mr. Glynn as requested.

The federal Medicare Program, established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, consists of two parts: Medicare Part A, which authorizes the payment of federal funds for hospitalization and post-hospitalization care; and Medicare Part B, which authorizes federal funding for medical and other health services. Medicare Part B also provides funding for certain services furnished to inpatients who are either not entitled to benefits under Part A, or who have exhausted their Part A benefits but are entitled to benefits under Part B.

---

[1] Mobilex, in fact, is the largest single portable x-ray provider in the country, accounting for more than fifty percent (50%) of the portable x-rays billed under both Medicare Parts A and B.

As provided in the Social Security Act, the Secretary of Health and Human Services administers the Medicare Program through Centers for Medicare and Medicaid Services ("CMS"). Medicare enters into provider agreements with health care providers and suppliers to establish the facilities' eligibility to participate in the Medicare Program. In order to be eligible for payment under the Medicare program, providers and suppliers must certify in these provider agreements that they understand payments of claims are conditioned on the claims and the underlying transactions complying with applicable laws, regulations and program instructions, including the Anti-Kickback statute and the Stark laws, 42 U.S.C. § 1395nn. Mobilex, as a supplier of services under Medicare, and the SNFs must enter into such provider agreements to receive Medicare reimbursement for their services.

The Balanced Budget Act of 1997 changed SNF reimbursement for patients covered under Medicare Part A to prospective payment system ("PPS"). Under PPS, SNFs are paid a fixed per diem amount for each Medicare Part A patient, which covers the routine, ancillary, and capital-related costs associated with that patient's stay. The per diem amount disbursed depends on the severity of the patient's condition. Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. To receive payment, an SNF must submit claims for its Part A patients to its fiscal intermediaries. Each SNF's Part A per diem includes the facility's costs for diagnostic radiology services performed for Part A inpatients. Thus, for mobile x-ray services furnished to Part A patients, the SNF pays the supplier for the services, and then bills Medicare for the service at the Part A rate.

For patients covered under Medicare Part A, Mobilex bills SNFs for the services it provides and the SNFs pay Mobilex for these services. In turn, SNFs submit claims for payments to Medicare. For patients covered under Medicare Part A, SNFs are reimbursed by

Medicare at a per diem rate.  Services provided for patients covered under Medicare Part B are also reimbursed at the Medicare allowable rate, however, Mobilex bills Medicare directly for these services.  CMS sets the maximum allowable amounts for covered Part B services through the Medicare Fee Schedule ("MFS").  Portable x-ray services submitted under Part B are reimbursed under the MFS.

At the end of each year, SNFs submit annual cost reports to CMS detailing the expenses and revenues for its facility along with the patient activity.  This annual cost report constitutes the final accounting of the facility's federal program reimbursement.  These reports are used by Medicare to determine whether a provider is entitled to more reimbursement than already received through interim payments or whether the provider has been overpaid.  Medicare relies upon the cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.

### B.  Allegations of Fraud

In his Amended Complaint, Plaintiff alleges that Mobilex is involved in a fraudulent scheme in which Mobilex offers substantial discounts to SNFs for x-ray services covered by the SNFs' per diem, per-patient Medicare or Medicaid reimbursements in exchange for patient referrals for which Mobilex can bill public insurance programs directly.  This practice, referred to in the health care industry as a "swapping arrangement," constitutes the payment of kickbacks in violation of the Anti-Kickback statute,[2] and claims to Medicare or Medicaid programs resulting from such arrangements therefore constitute false claims under the FCA.

---

[2] The Anti-Kickback Statute provides that:

> Whoever knowingly and willfully solicits or receives [or offers or pays] any remuneration (including any kickback, bribe or rebate) directly, or indirectly, overtly, or covertly, in cash or in

In addition to signing a Medicare provider agreement, which certifies to the government that the signatory health care provider or supplier agrees to abide by the Anti-Kickback laws and the Stark laws, Mobilex entered into a Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services Inspector General, which also conditioned further participation by Mobilex in the federal health care programs on compliance with the terms of the CIA.  The CIA required Mobilex, *inter alia*, to establish a Compliance Program ensuring that it complied with all applicable statutes, regulations, policies, and the CIA.

Plaintiff claims that in this case, portable x-ray services for Part B residents were billed by the supplier, Mobilex, to CMS.  SNF providers serviced by Mobilex paid and continue to pay Mobilex for services provided to patients with Part A coverage at a rate substantially below the MFS allowance.  In some cases, Mobilex does not require SNF's to pay anything at all for Part A portable x-ray services.  Mobilex solicits and accepts reduced rates for its Part A portable x-ray services as a *quid pro quo* for becoming the exclusive provider of portable x-ray services to all patients of the SNF, including the Part B residents.

Plaintiff claims that, in addition to steep discounting of rates related to Part A patients, Mobilex regularly chose simply not to collect its accounts receivable from the nursing homes, effectively providing its services for free.  Plaintiff claims that Mobilex's accounting, record-keeping, and collection practices related to its outstanding billed collectibles from SNFs suggests that in many cases Mobilex did not expect to be paid for Part A portable x-ray services.

---

kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $ 25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(1)(A) & 2(A)

Mobilex's lack of accurate record-keeping occurred at least between 2004 and 2007, and Relator believes it continues to the present.

In exchange for the reduced rates for Part A work, the nursing homes serviced by Mobilex refer all of their non-Part A work to Mobilex.  For the non-Part A work, Mobilex is able to bill the full Medicare allowable rate directly to the federal and state healthcare programs. The Amended Complaint states that since at least 2002, Mobilex's contracts for the performance of portable x-rays have not reflected a discount.  Instead, the discounts offered by Mobilex are recorded on a separate document called the Facility Data Sheet.

Plaintiff alleges that the requirements for providing discounts to providers in the Anti-Kickback Act were not followed here.  The discounts provided by Mobilex, Plaintiff contends, constitute illegal "remuneration" as that term is used in the Anti-Kickback statute.  These discounted rates are below fair market value and confer a benefit on the SNFs that is intended to account for the volume or value of federally-funded business referred, in turn, to Mobilex. Specifically, Plaintiff alleges that Mobilex offers and pays such remuneration in exchange for referrals for Part B portable imaging services.  This scheme is referred to as "swapping," because Mobilex swaps cut-rate or free Part A portable imaging services for lucrative exclusivity of providing Part B patient services.  Plaintiff claims this swapping scheme violates the FCA because Mobilex knowingly submits false claims for Part B reimbursement to Medicare when Mobilex falsely certifies that the claims comply with the Anti-Kickback statute.

### C.  Alleged Retaliation by Mobilex

Plaintiff states that while employed at Mobilex's Midwest Regional Office, on multiple occasions in 2005 and 2006 he notified Mobilex CEO Mr. Glynn about the fraudulent scheme alleged herein.  At a meeting on March 8, 2006, according to Plaintiff, Mr. Glynn reportedly

admitted that Mobilex was offering rates to its clients that were not compliant with Medicare rules and regulations.  Plaintiff asked Mr. Glynn to stop offering discounted Part A rates or expose the fraud.  Mr. Glynn reportedly declined to comply with either of Plaintiff's requests, and instructed Plaintiff not to take any such actions himself.  Plaintiff claims that he alerted other officers and managers of Mobilex to the illegal practice of the swapping scheme.  They, too, acknowledged the allegedly fraudulent practices but refused to take actions to stop them. Plaintiff claims he was unlawfully terminated by Mobilex in September 2006 out of retaliation of his efforts, after confronting Mobilex officers about the swapping arrangement scheme.

The Amended Complaint contains nine causes of action: Count I alleges violations of the FCA for knowingly presenting false claims to the United States for services rendered to patients unlawfully referred to Mobilex in exchange for kickbacks; Count II alleges unlawful retaliation under 31 U.S.C. § 3730(h) for Mobilex's termination of Plaintiff for his reporting fraudulent activity; and Counts III through IX allege violations of state anti-fraud statutes for Defendant's actions in Illinois, Massachusetts, Virginia, New York, Texas, Michigan, and Georgia, respectively.  Neither the United States, nor any state government has intervened or filed statements of interest regarding the case.

### III.  STANDARD OF REVIEW

The Plaintiff's Amended Complaint should only be dismissed under Fed. R. Civ. P 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted."  Generally, a complaint must merely contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The district court, in turn, "must read all well-pleaded allegations of the complaint as true."  *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997).  This "tenet is inapplicable to legal conclusions, or legal conclusions couched as factual

allegations." *McCormick v. Miami Univ.*, No. 1:10-cv-345, 2011 U.S. Dist. LEXIS 48467, at

*10 (S.D. Ohio May 5, 2011) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009)).  The

plaintiff's ground for relief must entail more than "a formulaic recitation of the elements" of a

cause of action.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

 A well-pleaded complaint must "give the defendant fair notice of what the claim is, and

the grounds upon which it rests." *Nader v. Blackwell*, 545 F.3d 459, 470 (6th Cir. 2008).  The

plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."

*Twombly*, 550 U.S. at 570.  To "survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the

'complaint must contain either direct or inferential allegations respecting all the material

elements to sustain a recovery under some viable legal theory.'" *Noble v. Genco I, Inc.*, No.

2:10-cv-648, 2010 WL 5541046, at *2 (S.D. Ohio Dec. 30, 2010) (quoting *Scheid v. Fanny

Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)).  Finally, the complaint must be

construed in a light most favorable to the party opposing the motion to dismiss.  *Davis H. Elliot

Co. v. Caribbean Utils. Co., Ltd.*, 513 F.2d 1176, 1182 (6th Cir. 1975).

 In addition, Fed. R. Civ. P. 9(b) requires that "in any complaint averring fraud or mistake,

the circumstances constituting fraud or mistake shall be stated with particularity." *Yuhasz v.

Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003).  The heightened pleading standard set

forth in Rule 9(b) applies to complaints alleging violations of the FCA.  *Id.*  The Sixth Circuit

has held that to satisfy Rule 9(b), a plaintiff must at a minimum "allege the time, place, and

content of the alleged misrepresentation" as well as "the fraudulent scheme; the fraudulent intent

of the defendants; and the injury resulting from the fraud." *Bennett v. MIS Corp.*, 607 F.3d 1076,

1100 (6th Cir. 2010) (internal citations omitted).  A complaint's failure to comply Rule 9(b)'s

pleading requirements is treated as a failure to state a claim under Rule 12(b)(6).  *United States ex rel. Howard v. Lockheed Martin Corp.*, 499 F. Supp. 2d 972, 976 (S.D. Ohio 2007).

## IV. LAW AND ANALYSIS

### A. Sufficiency of Plaintiff's Fraud Allegations

#### 1. Alleged Remuneration

Mobilex first moves the Court to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) for failure adequately to state a claim of violations of the FCA.  Specifically, Mobilex contends that Plaintiff's Complaint fails to allege sufficient details of "remuneration" received by Mobilex under the alleged swapping scheme, because Plaintiff provides no facts establishing the fair market value of mobile x-ray services.  Mobilex argues that Plaintiff's allegations, even taken as true, cannot prove the alleged violations of the Anti-Kickback statute and the Stark laws upon which his FCA claims are predicated.

The FCA's fraud and conspiracy provisions provide, in part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of subparagraph (A), (B). . .

    . . . is liable to the United States Government for a civil penalty . . . .

*See* 31 U.S.C. § 3729(a).

The Government has a statutory right to intervene and take over prosecution of an FCA case.  If it chooses not to, as in this case, the FCA's *qui tam* provisions award successful relators of fraud who proceed independently a reasonable amount of the proceeds or settlement.  *Id.*

§ 3730(d)(2); *See United States ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 18 (2d Cir. 1990) ("'The purpose of the *qui tam* provisions of the False Claims Act is to encourage private individuals who are aware of fraud being perpetrated against the Government to bring such information forward.'") (quoting H.R. Rep. No. 99-660, at 22 (1986)).

As stated above, the Anti-Kickback statute prohibits Mobilex from offering "any remuneration, (including any kickback, bribe or rebate)" in return for "in return for referring an individual for . . . service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(1)(A). This Court has interpreted the meaning of "remuneration" broadly as "anything of value in any form whatsoever," reasoning that "[t]he Anti-Kickback Statute uses the term 'any remuneration,' which suggests an expansive reading of the form of any kickback directly or indirectly, as opposed to a narrow reading." *U.S. ex. Rel. Fry v. The Health Alliance of Greater Cincinnati*, No. 1:03-CV-001672008, U.S. Dist. LEXIS 102411, at *20 (S.D. Ohio Dec. 18, 2008). If Mobilex falsely certifies its compliance with the Anti-Kickback statute in its Medicare reimbursement claims and reports, as Plaintiff alleges, Mobilex's claims violate the FCA. *See id* at *12. ("A false certification of compliance with the Anti-Kickback Statute and Stark Statute in a Medicare cost report is actionable under the FCA.").[3]

The Amended Complaint alleges that in furtherance of the Medicare fraud scheme, Mobilex bills the SNFs for its portable x-ray services at rates below market value, and at times even below Mobilex's costs for the services. FAC ¶¶ 67, 71. Mobilex does this in exchange for securing exclusive referrals of the SNFs' Medicare Part B and Medicaid patient care services.

---

[3] The Stark Statute makes illegal certain physician referrals to facilities with which the physician has a financial relationship. 42 U.S.C. § 1395nn. Its provisions define a financial relationship as an ownership or investment interest in the entity by the physician or an immediate family member of such physician, or as a compensation arrangement between any such persons. 42 U.S.C. § 1395nn(B)(2); *Fry*, 2008 U.S. Dist. LEXIS, at *15.

*Id.* ¶¶ 56, 68. Mobilex argues that Plaintiff's failure to allege either what the fair market value was for these services, the amount actually charged by Mobilex during the same time period, or the difference between the two, is fatal to the Complaint's success because *qui tam* actions must plead facts establishing the fair market value of the goods or services in question and the actual prices charged by the alleged wrongdoer. Mobilex claims that Plaintiff's failure to include what the fair market value was for any of the relevant services during the relevant time periods renders the Amended Complaint "ripe for dismissal." (Dkt. 40, at 7.) Mobilex, however, fails to provide adequate support this characterization of existing precedent.

First, in *Woods*, the plaintiff's failure to identify the fair market value of the goods and services provided was but one of a laundry list of deficiencies contributing to its dismissal. *See U.S. ex rel. Woods v. North Arkansas Reg'l Med. Center*, No. 03-3086, 2006 WL 2583662, at *3 (W.D. Ark. 2006). [4] And in *U.S. v. Center for Diagnostic Imaging, Inc.*, the plaintiffs "failed to allege that the discounted services were offered for less than fair market value" altogether. 787 F.Supp.2d 1213, 1223 (W.D. Wash. 2011) (adding that "[n]or have [plaintiffs] alleged that the discounted prices were not commercially reasonable"). These cases are unlike the case *sub judice*, in which Plaintiff repeatedly alleges that Mobilex's x-ray services were offered not just below fair market value, but even below cost or for no charge at all. FAC ¶¶ 67, 71.

---

[4] In *Woods*, the amended complaint failed to identify any of the following:

> (1) the particular individuals who are alleged to have made the decision to provide office space, staff, etc., to [the doctor] for less than fair market value; (2) what the fair market value of these goods and services actually was and what [the doctor] was charged; (3) the names of any of the patients [the doctor] allegedly referred to [the medical center] in exchange for the provision of office space, staff, etc., at less than fair market value; (4) who was involved in submitting the fraudulent claims and cost reports; (5) what the content was of the fraudulent claims and cost reports; (6) what monies were fraudulently obtained as a result of the alleged illegal arrangement; or (7) how plaintiff learned of the alleged fraudulent claims and their submission for payment.

*Id.*

Contrary to Mobilex's contentions, Plaintiff does support his allegations of Mobilex undercharging SNFs for x-ray services at below-market rates with specific facts.  The Complaint provides, for example, that "in 2001, Mobilex's actual cost to perform a portable x-ray averaged approximately $96.62.  For Medicare Part A patients, Mobilex's *per diem* rate ranged from $0.45 to $1.00 per patient day and the flat fee ranged from $50.00 to $75.00 per exam."  FAC ¶ 69.  While some additional explanation might have been helpful, these factual allegations on their face suggest portable x-ray services being charged to Mobilex's Medicare Part A clients at a rate significantly below Mobilex's "actual costs" for those services.

The Amended Complaint also provides that the 2006 Medicare Fee Schedule in Ohio, "allowed $145.25 for a single-view chest x-ray," and by 2009 it "allowed $162.40 for a single view chest x-ray."  FAC ¶ 70.  While Mobilex takes issue with the appropriateness of comparing 2006 and 2009 Medicare Fee Schedules with Mobilex's cost and pricing data from 2001 instead of 2006 and 2009, such scruples do not warrant dismissal of the complaint in the same way a wholesale failure to allege below-market provision of services might.  *See, e.g.*, *Ctr. for Diagnostic Imaging*, 787 F. Supp. 2d at 1223.  At the pleading stage, prior to discovery, the plaintiff cannot be expected to provide complete details of the necessary sensitive corporate statistics to support his allegations on issues of costs and pricing.  It is sufficient that the Plaintiff's Amended Complaint alleges that Mobilex provided its x-ray services to SNFs at below-market and below-cost rates, and provides some factual details which, at least on their face, support those allegations.  *See Twombly*, 550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.").

Mobilex claims that Plaintiff fails to allege the times when Mobilex allegedly charged for services below market value, or which facilities in particular Mobilex provided services below market value.  This is simply not accurate.  For instance, the Amended Complaint states that Mobilex has offered significant discounts to SNFs that are part of large chain organizations if all the chain's facilities contract with Mobilex, "upon information and belief, from 2004 to present." FAC ¶ 89.  The Amended Complaint further specifies the timeframe for specific below-cost discounts offered to specific SNFs, such as "[i]n 2006, Mobilex began providing services to the Sava Senior chain of SNFs" for a "per bed rate of between ten cents and one dollar *per diem*, a below-cost rate."  FAC ¶ 87.  Besides Sava Senior, Plaintiff names a number of other specific SNFs, including specific facilities, which have been offered, and received, such discounts in exchange for contracting exclusively with Mobilex for their Medicare Part B patients' services. FAC ¶¶ 89, 102, 106-07.

Mobilex insists that Plaintiff fails to firmly establish that Mobilex was charging less than the fair market rate, or even less than the allowable rates under the Medicare Fee Schedule for any given time period.  The Amended Complaint, however, also includes detailed allegations of Mobilex deciding not to pursue collection of its billables from its clients *at all* for its Part A services.  FAC ¶¶ 71, 94.  For example, the Amended Complaint alleges that from 2005-2007, Mobilex's did not provide sufficient information to allow its subcontractors to bill for their services (such as Apex Radiology, which performed readings for Mobilex from 2002 to 2007). FAC ¶¶ 101-07.  Whatever the precise market rate might have been for specific x-ray services at any specific time, the Court is comfortable in assuming it was higher than zero.  Providing the x-ray services for free would necessarily be providing them at below market rates and below cost.

This Court has determined that indirect remuneration schemes such as the one described by Plaintiff, which involve offers of discounted services in exchange for patient referrals, may violate the Anti-Kickback statute.  In *U.S. ex. rel. Fry*, on the issue of whether "remuneration" was received under the Anti-Kickback statute, the Court ruled that "compensation arrangements that take into account the volume or value of referrals or business otherwise generated between the parties" fall "within the scope of the statute."  2008 U.S. Dist. LEXIS, at *22-23 (stating that "the Anti-Kickback statute was amended to add the term 'remuneration' when investigations showed kickbacks were taking the form of sham rentals for office space, rebates equal to the percentage of referral business, outright gifts of cars, TV's, and prepaid vacations").

Accordingly, Plaintiff's allegations are more than "merely consistent with" Mobilex having violated the Anti-Kickback statute.  *See Iqbal*, 129 S. Ct. at 1949 (quoting *Twombley*, 550 U.S. at 557).  If accepted as true, Mobilex's alleged agreements with SNFs to provide free or heavily discounted, below market x-ray services under Medicare Part A in exchange for exclusive referrals for the SNFs' Medicare Part B services states a claim for relief from violations of the Anti-Kickback statute and the FCA "that is plausible on its face."  *Id*.  The Court accordingly rejects Mobilex's argument for dismissal under Rule 12(b)(6).

## 2.  Allegations of Specific Fraudulent Claims

Mobilex also argues for dismissal of Plaintiff's Amended Complaint under Rule 9(b), which provides additional pleading requirements in fraud cases such as this.  *See Yuhasz*, 341 F.3d at 563.   Mobilex's chief complaint is that the Amended Complaint fails to allege facts of any specific fraudulent claims presented for payment to the government in violation of the FCA, as required by Rule 9(b).  Mobilex also argues generally that Plaintiff fails to provide enough particulars of the alleged fraud to place Mobilex on adequate notice of the claims brought against

-14-

it.  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  The Rule is in place to "alert defendants 'as to the particulars of their alleged misconduct' so that they may respond,'" prevent unwarranted "fishing expeditions," "to protect defendants' reputations from allegations of fraud," and "and to narrow potentially wide-ranging discovery to relevant matters."  *Chesbrough*, 655 F.3d at 466 (internal citations omitted).

Pleading fraud with particularity requires that the plaintiff allege: (1) "the time, place, and content of the alleged misrepresentation"; (2) "the fraudulent scheme"; (3) the defendant's fraudulent intent; and (4) "the injury resulting from the fraud."  *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.* ("*Bledsoe II*"), 501 F.3d 493, 503 (6th Cir. 2007).  The Sixth Circuit, in *Bledsoe II*, "held that, where a relator alleges a 'complex and far-reaching fraudulent scheme,' in violation of § 3729(a)(1), it is insufficient to simply plead the scheme; he must also identify a representative false claim that was actually submitted to the government."  *Chesbrough*, 655 F.3d at 470 (citing *Id.* at 510-11) (internal citations omitted).

Relying on *Bledsoe II*, Mobilex argues that because Plaintiff's allegations fail to identify any specific false claim submitted, the Amended Complaint must be dismissed.  Mobilex alleges that Plaintiff does not identify a year or range of years when a specific claim was made to the Government.  Plaintiff challenges Mobilex's interpretation of the pleading standard under 9(b), arguing that despite *Bledsoe II*'s holding, *supra*, recent cases have discredited Mobilex's position that all FCA complaints must attach a specific claim that was submitted falsely.  Plaintiff also argues that despite the Amended Complaint not providing a specific submitted false claim, the

allegations strongly support the inference that claims for Part B service were submitted by Mobilex pursuant to swapping agreements, which were therefore false claims.

Plaintiff is correct in arguing that the requirement that "particularized allegations of an actual false claim . . . must be specifically pled if a complaint is to survive Rule 9(b) scrutiny" has been somewhat lessened since *Bledsoe II*. *Bledsoe II*, 501 F.3d at 505. The Sixth Circuit's most recent pronouncement on the issue in *Chesbrough* tempered the strict holding from *Bledsoe II* with the following:

> [T]he requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted. Such an inference may arise when the relator has "personal knowledge that the claims were submitted by Defendants . . . for payment."

*Chesbrough*, 655 F.3d at 471 (quoting *United States ex rel. Lane v. Murfreesboro Dermatology Clinic, PLC*, No. 4:07-cv-4, 2010 U.S. Dist. LEXIS 46847, at *5 (E.D. Tenn. May 12, 2010)).

This Court is of the opinion that, unlike the plaintiffs in *Chesbrough* itself, the Plaintiff's Amended Complaint here warrants just such a "relaxing" of the specific claim requirement. The Amended Complaint contains well-pleaded particularities drawn from Plaintiffs' personal experience that, collectively, support a strong inference that Mobilex submitted claims pursuant to the swapping scheme that Plaintiff alleges, and thus, would have been fraudulent. *See id.* at 467 ("When a claim expressly states that it complies with a particular statute, regulation, or contractual term that is a prerequisite for payment, failure to actually comply would render the claim fraudulent."). While no specific claim is identified, specific representative examples of the swapping scheme at issue are identified, and in this case that is enough to satisfy the particularity requirements of Rule 9(b).

Plaintiff alleges specific conversations with Mobilex's CEO in which Mr. Glynn acknowledged that Mobilex performed Medicare Part A work, FAC ¶ 76, and on January 19, 2006, and March 8, 2006, Glynn referenced "per diem payments" received from Part A patients. FAC ¶¶ 86-87.  Mr. Glynn and others at Mobilex allegedly admitted to charging SNFs non-Medicare compliant rates.  Plaintiff also provides, in an attachment to the Amended Complaint, an alleged list of a sample of the SNFs for which Mobilex was providing both Medicare Part A and Part B services, pursuant to fraudulent swapping arrangements.  FAC ¶¶ 106-107.  The nature of the fraud alleged does not lend itself to identifying specific claims, as Plaintiff is arguing that the remuneration here involves agreements to send Mobilex referrals which Mobilex then bills at a compliant rate.  Thus, no particular claim for reimbursement would itself be indicative of the fraud, but rather the agreement pursuant to which the services within the claim were rendered.

As a "representative example[] of [the defendants'] alleged fraudulent conduct" *see Bledsoe II*, 501 F.3d at 510, the Amended Complaint provides, *inter alia*, the alleged agreement between the SNF chain Sava Senior and Mobilex.  Plaintiff alleges that Mobilex began providing services for Sava Senior in 2006; that Mobilex's rates offered to some Sava Senior facilities was below-cost; and that Mobilex's national vice president, Robin Reichert, stated that the rate would need to stay there or else Mobilex would risk losing Sava Senior's business—presumably referring to the referrals Mobilex received in exchange for the low rates.  FAC ¶ 88.  Accepting these allegations as true, as the Court must, *see Weiner*, 108 F.3d at 88, raises a high probability that Mobilex submitted claims for reimbursement to the government for Medicare services provided pursuant to the swapping scheme described in Plaintiff's Amended Complaint.

Plaintiff's Amended Complaint is distinguishable from the Chesbrough's because of the Mobilex and the SNFs with which it contracts expressly certify that the submitted claims for reimbursement are not fraudulent. The major failure of the Chesbrough's complaint of fraud was its inability to identify when or where the allegedly deficient providers had certified that their services would comply with a higher standard. *See Chesbrough*, 655 F.3d at 468 ("Although the Chesbroughs allege that VPA failed to meet 'objective standards' for testing, they do not allege that VPA was expressly required to comply with those standards as a prerequisite to payment of claims.") On the contrary, here Plaintiff asserts that Mobilex certified, to the government, its compliance not just with the Anti-Kickback statute and Stark laws, but also the Corporate Integrity Agreement. FAC ¶¶ 28, 59-61. Plaintiff alleges that under these certifications, compliance with the Anti-Kickback statute and other applicable laws and regulations "was required to obtain payment" from the government. Thus, *any* bills or claims submitted to the government thereafter, such as those referenced in Exhibit 1 to the Amended Complaint, would be fraudulent if Mobilex offered SNFs discounted Part A services in exchange for Part B referrals, as alleged.

Finally, Mobilex broadly argues that Plaintiff's Amended Complaint fails adequately to identify the "who, what, when, where, and how" requirements of a successful complaint for violations of the FCA. *See, e.g., DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (holding, as many courts have, that "particularity" under Rule 9(b) "means the who, what, when, where, and how: the first paragraph of any newspaper story"). Looking back at the Sava Senior example, however, Plaintiff easily meets his pleading burden with respect to those common factors of particularity. Plaintiff provides representative examples of which SNFs were involved; the nature of the swapping scheme, including even the degree of the discounted

Mobilex provided; and the range of years, "2004 to the present," during which Mobilex and large SNFs like Sava Senior have engaged in the swapping scheme. The alleged swapping scheme is set forth in detail, and the Amended Complaint names multiple Mobilex officers, including the CEO, who explicitly acknowledged, and then refrained from addressing, the fraud. For these reasons, Plaintiff's Amended Complaint complies with Rule 9(b)'s requirements for pleading fraud under the FCA.

### B.  Plaintiff's Retaliation Claim

Plaintiff alleges that Mobilex retaliated against him by terminating him because of his actions taken in furtherance of bringing these claims of fraud against it, in violation of Section 3730(h) of the FCA.[5] Mobilex attacks Plaintiff's unlawful retaliation claim on three grounds. First, Mobilex argues that because the Amended Complaint fails to identify a plausible FCA violation, Plaintiff's claim for unlawful termination must fail as well because Plaintiff cannot show involvement in a protected activity. Secondly, Mobilex argues that Plaintiff fails to allege sufficient facts to prove that Plaintiff placed Mobilex on notice that he was pursuing an FCA action, which is a necessary element for his unlawful retaliation claim. Third, Mobilex claims that the unlawful retaliation claim should be dismissed because the concerns Plaintiff brought to Mobilex CEO Mr. Glynn's attention were part of his duties in his position at Mobilex, and complaints for retaliation must be dismissed if raising concerns was part of the relator's job description.

---

[5] Section 3730 provides, in relevant part, that:

> "[a]ny employee [who] . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter [shall] be entitled to all relief necessary to make that employee . . . whole."

31 U.S.C. § 3730(h)(1).

Section 3730(h) protects *qui tam* "whistleblowers" who pursue or investigate fraudulent activity of their employers from retaliation.  *See McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000).  For a plaintiff to establish that he was retaliated against in violation of Section 3730(h), he must prove: (1) he was engaged in a protected activity; (2) the employer knew about the protected activity; and (3) the employer must have discharged or otherwise discriminated against the alleged whistleblower as a result of the protected activity.[6] *Georgandellis v. Holzer Clinic, Inc.*, No. 08-cv-626, 2009 WL 1585772, at *7 (S.D. Ohio June 5, 2009) (citing *McKenzie*, 219 F.3d at 514).

Mobilex's first argument for dismissal of the Plaintiff's retaliation claim fails.  As determined above, Plaintiff has alleged sufficient facts to support a claim for violations of the FCA on the part of Mobilex, and even if he had not successfully pled an FCA violation under Section 3729, it would not necessarily invalidate his claim for retaliation under Section 3730. *See Georgandellis*, 2009 WL 1585772, at *9; *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996) ("The case law is clear that a retaliation claim can be maintained even if no FCA action is ultimately successful or even filed.").

Mobilex challenges the sufficiency of the Amended Complaint's allegations regarding the second, "notice" element for establishing retaliation under Section 3730(h), arguing that Plaintiff fails to show that he had adequately placed Mobilex on notice of his FCA investigation. The Sixth Circuit has stated that "[w]hen seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action

---

[6] "'Protected activity' means 'lawful acts done by the employee on behalf of the employee or others in furtherance of an [FCA] action, including investigation for, initiation of, testimony for, or assistance in an [FCA] action filed or to be filed . . . .'"  *United States ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 449 (6th Cir. 2007) (citing 31 U.S.C. § 3730(h)).

or assisting in an FCA action brought by the government."  *Yuhasz*, 341 F.3d at 568 (quoting

*Ramseyer*, 90 F.3d at 1522).

In his Amended Complaint, Plaintiff states that he personally notified Mr. Glynn and

others at Mobilex on numerous occasions of the fraud scheme.  FAC ¶¶ 86-87.  Crucially,

however, nowhere does Plaintiff allege that he notified Mr. Glynn, or anyone else at Mobilex, of

his intent to investigate the fraud himself, much less that he was contemplating a *qui tam* action

or assisting in furthering an action under the FCA against Mobilex.  Rather, the Complaint

merely states that after questioning Mr. Glynn and the others about Mobilex's fraudulent

practices, and asking Mr. Glynn to expose the fraud, he was let go.  *Id.*

Alleged whistleblowers bringing complaints of fraud to their employer "'must make clear

their intentions of bringing or assisting in an FCA action in order to overcome the presumption

that they are merely acting in accordance with their employment obligations.'"  *Yuhasz*, 341 F.3d

at 568 (quoting *Ramseyer*, 90 F.3d at 1523 n. 7).   Plaintiff himself acknowledges in his briefing

that to successfully state a retaliation claim under Section 3730(h) he must "allege that his

activities have given defendants reason to believe he was contemplating filing a qui tam

complaint."  (Dkt. 44, at 33.)  Simply insisting to Mobilex that it should cease certain activities

which Plaintiff believed to be fraudulent does not, even when interpreting the standard broadly,

constitute reasonable notice to his employer that he intended to pursue legal action to end the

fraud.  *See Marlar*, 525 F.3d at 449 (stating that plaintiff "repeatedly 'object[ing] to her

superiors' about the inaccurate medical records" without more "likely do not suffice to show that

BWXT was on notice of Ms. Marlar's protected activity").

Based on the Plaintiff's own pleadings, he never indicated any intentions to pursue

investigation of the fraud, report the fraud, or otherwise take action or assist the government in

prosecuting the fraud under the FCA.  Therefore, as a matter of law, his claim for unlawful

retaliation under the FCA must fail.

## V.  CONCLUSION

Defendant's Motion to Dismiss Relator's Amended Complaint is **GRANTED** with

respect to Plaintiff's claim for unlawful retaliation under the FCA.  Count II of the Amended

Complaint is, accordingly, **DISMISSED**.  Defendant's Motion is **DENIED** with respect to

Plaintiff's remaining claims for violations of the FCA and similar state law anti-fraud statutes.


**IT IS SO ORDERED.**

**s/Algenon L. Marbley**
**Algenon L. Marbley**

**DATED: February 27, 2011**